Abbott SEKAQUAPTEWA, etc.,
Plaintiff-Appellee,

v.

Peter MacDONALD, etc.,
Defendant-Appellant,

Griffin B. Bell, etc., Defendant-Appellee.

No. 77–1957.

United States Court of Appeals,
Ninth Circuit.

May 15, 1978.

---

Lawrence A. Ruzow (argued), of Vlassis, Ruzow & Linzer, Phoenix, Ariz., for defendant-appellant.

John Paul Kennedy (argued), of Boyden, Kennedy, Romney & Howard, Salt Lake City, Utah, for plaintiff-appellee.

Before HUFSTEDLER and KILKENNY, Circuit Judges, and GRANT,* District Judge.

HUFSTEDLER, Circuit Judge:

This appeal is the latest episode in the long and bitter conflict between the Hopi and Navajo Indian Tribes over the division of reservation lands.

The dispute has its origins in an Executive Order of December 16, 1882, withdrawing 2,500,000 acres of land in northeastern Arizona from the public domain "for the use and occupancy of the Moqui [Hopi], and such other Indians as the Secretary of the Interior may see fit to settle thereon." For many years thereafter, the Hopi and the Navajo asserted conflicting claims to the tract, and all attempts to resolve the controversy by agreement and administrative action failed. The two tribes, the Secretary of the Interior, and Congress then decided to resort to the courts.

In 1958, Congress enacted a statute authorizing either tribe to commence or to defend a quiet title action against the other (and against the Attorney General on be-

---

* Honorable Robert A. Grant, Senior United States District Judge, Northern District of Indiana, sitting by designation.

half of the United States as trustee of the territory). The Hopi brought suit, and a three-judge district court held that the Hopis were entitled to the exclusive possession of a small portion of the Reservation, known as Land Management District 6. It also held that the Hopi and the Navajo had joint, undivided and equal interests in the remainder, thereafter known as the Joint Use Area. (*Healing v. Jones* (D.Ariz.1962) 210 F.Supp. 125, aff'd (1963) 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703.)

The *Healing* case unfortunately failed to live up to the promise of its name. Claiming that the Navajo were resisting implementation of the district court's judgment giving the Hopi rights to equal use of the Joint Use Area, the Hopi petitioned the district court in 1970 for an order of compliance to enforce their rights under the *Healing* decree. The district court's subsequent order of compliance, requiring a reduction in Navajo livestock, limitation of livestock grazing, and reduction of Navajo construction in the Joint Use Area, was affirmed by this court. (*Hamilton v. MacDonald* (9th Cir. 1974) 503 F.2d 1138.) The Navajo tribe was later cited for contempt for failing to reduce livestock and control construction as ordered. The Navajo appealed this order and an order implementing a Government plan to effectuate the order of compliance. In a judgment which stated that the Navajos' actions "indicate conscious foot dragging" with respect to the implementation of the orders of the district court dating back to *Healing*, this court affirmed the contempt citation. (*Sekaquaptewa v. MacDonald* (9th Cir. 1976) 544 F.2d 396, 406.)

In another effort to resolve this dispute, Congress enacted another statute in 1974 (25 U.S.C. §§ 640d *et seq.*), providing for the appointment of a mediator to assist in negotiating a settlement and a partition of the rights and interests of the Hopi and Navajo Tribes in the Joint Use Area. The statute provided that if no voluntary agreement was reached within 180 days, the district court was "authorized to make a final adjudication, including partition of the joint use area, and enter the judgment in the supplemental proceedings in the *Healing* case." (25 U.S.C. § 640d–3(a).) A federal mediator was appointed, but he failed to achieve a settlement. He submitted a report to the district court recommending that the Joint Use Area be judicially partitioned and suggested the formula for the partition.

On September 9, 1976, following an evidentiary hearing, the district court proposed to enter a judgment approving the partition line recommended by the mediator and stated that:

" . . . rulings are reserved with respect to matters that will come before the court for determination hereafter, such as adjustments between the Navajo Tribe and the Hopi Tribe as to the Peabody leases; access to shrines; inequality in value of areas partitioned; rental payments required by [25 U.S.C. § 640d–15]; life estates; phased relocations; mixed marriages; federal employees, etc."

On February 10, 1977, the court entered a judgment of partition and an order establishing a schedule for further proceedings. The Navajo appeal the judgment of partition, asserting that the district court abused its discretion under the 1974 Act.

A second issue presented concerns the precise size of the area to be partitioned. The mediator noted in his report that the Navajo had raised a question regarding the boundaries of the 1882 Reservation and the total acreage of the Joint Use Area. According to information provided the mediator, a survey of the Reservation was made in 1914. A subsequent survey made in 1963, and officially approved by the Department of the Interior in 1965, disclosed that the 1914 survey had reduced the size of the 1882 Reservation along its southern and western boundaries by approximately 50,000 acres. The Navajo claim that the 1914 survey, even if erroneous, permanently fixed the boundaries of the 1882 Reservation and thereby had the effect of adding those acres to the Navajo Reservation. The Navajo also claim that, within the disputed area, are some 14,000 acres covered by individual allotments and railroad grant lands

which are vested for the benefit of the Navajo.

The mediator did not define either the proper south and west boundaries of the Joint Use Area or the total acreage to be divided; he believed that these findings were to be made by the court. The mediator proposed four alternative plans which retained the same basic partition line but allocated two parcels of land, known as Areas A and B, differently depending on the court's determination with respect to the total acreage to be partitioned. At a pretrial conference, the Navajo raised the boundary question. In its order of March 11, 1976, the district court concluded that the issue of the boundaries of the Joint Use Area had been resolved in the *Healing* decision and that consideration of the Navajo claim was therefore foreclosed by the doctrine of *res judicata*. On this appeal, the Navajo challenge the district court's disposition of the boundary question.

I

We must first decide whether we have jurisdiction to entertain this appeal. The specific reservation of rulings, and the scheduling of further proceedings, with respect to "issues in this case" by the district court suggest that the judgment of partition may be an interlocutory order, rather than the final appealable judgment. (28 U.S.C. § 1291.[1])

The Supreme Court has often pointed out that a decision is "final" within the meaning of § 1291 even if it is not necessarily the last order possible in a case. (*Cohen v. Beneficial Industrial Loan Corp.* (1949) 337 U.S. 541, 545, 69 S.Ct. 1221, 93 L.Ed. 1528.) "A pragmatic approach to the question of finality has been considered essential to the achievement of the 'just, speedy, and inexpensive determination of every action' . . . ." (*Brown Shoe Co. v. United States* (1962) 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510.) With respect to orders falling within the "twilight zone of finality," the most important competing considerations are the " 'inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other'." (*Gillespie v. United States Steel Corp.* (1964) 379 U.S. 148, 152–53, 85 S.Ct. 308, 311.)

While it is true that review of the judgment of partition could be characterized as piecemeal review of the case, the inconvenience and cost of trying the case will not be any greater if we review the partition order now instead of compelling the district court to determine all of the issues remaining between the parties with the validity of the partition still unresolved. On the contrary, all of the remaining questions between the Hopi and the Navajo set out by the district court presuppose the validity of the judgment of partition and the separation of the two tribes in respect of their territories. The partition order is " 'fundamental to the further conduct of the case'," within the meaning of *Gillespie, supra*, 379 U.S. at 154, 85 S.Ct. at 312.

Long before its expansive reaffirmation in *Gillespie* of the pragmatic construction to be given the finality requirement, the Supreme Court had firmly established a narrow relaxation of the finality rule for orders transferring property. In *Forgay v. Conrad* (1848) 47 U.S. (6 How.) 201, 12 L.Ed. 404, the Court held appealable a lower court order providing for the immediate delivery

---

1. 28 U.S.C. § 1292(b) and F.R.Civ.P. 54(b) are unavailable because the district court did not certify that an immediate appeal would materially advance the ultimate termination of the litigation. The partition judgment is not an order directed to either Indian Tribe; rather, like the original quiet title action, the order is in the nature of a declaration of rights to respective parcels of land, and a directive to the Secretary of the Interior, in conformity with the 1974 Act, to take the steps necessary to separate the tribes. In addition to partitioning the Joint Use Area, the order is quasi-injunctive because it requires each tribe to administer the area which has been partitioned to it, and each is also prohibited from beginning or continuing new construction in the area partitioned to the other. We need not decide whether the partition order is appealable as an interlocutory order granting an injunction (28 U.S.C. § 1292(a)(1) ) since we find that it satisfies the pragmatic definition of finality applicable to 28 U.S.C. § 1291.

to an assignee in bankruptcy of property that had been previously conveyed by the bankrupt, even though the case was to continue for an accounting. The case was appealable because it involved an order directing the immediate delivery of property, the order in question was final in itself even if the case was not fully resolved, and immediate execution of the order threatened irreparable hardship to the appellant. (Id. at 204–05. *Accord : Radio Station WOW, Inc. v. Johnson* (1945) 326 U.S. 120, 125–26 & n.2, 65 S.Ct. 1475, 89 L.Ed. 2092; *Pioche Mines Consolidated, Inc. v. Fidelity-Philadelphia Trust Co.* (9th Cir. 1951) 191 F.2d 399, 400.)

█ The partition order does not direct the immediate delivery of property by the Navajo to the Hopi, but the order, nevertheless, effectively transfers separate possession and use of lands previously held jointly, thereby depriving the Navajo of the right to possess and use almost one million acres of land previously open to them. By declaring that the administration of their respective halves of the Joint Use Area is to be the responsibility of the respective tribes and by requiring the surveying and fencing of the lands partitioned, the Hopi and Navajo interests are practically severed. The task of surveying, fencing, and physically separating the tribes was directed to commence "forthwith." Relocation of the Navajos now in Hopi territory is in process; the hardships of relocation will be exacerbated, not eased, by a refusal to undertake immediate review. Thus, the judgment of partition is sufficiently "final" to be appealable under Section 1291, either as an "order" directing the delivery of property, or as an "order," the effectuation of which is a source of almost all of the remaining issues in the case.

2. Instead of partitioning the Joint Use Area, the Navajo would in effect "buy out" the Hopi by providing them with monetary compensation for their legal rights in the Joint Use Area.

3. The mediator's proposal, which was adopted by the district court, would divide the total acreage equally between the tribes; give the Navajo 50.8% of the sheep grazing units, and

## II

The Navajo contend that the district court abused its discretion in issuing the partition judgment. They claim that the district court improperly foreclosed consideration of alternatives to partition because the court erroneously believed that the 1974 Act mandated a court-ordered partition if the mediator was unsuccessful in producing a negotiated settlement. The Navajo also claim that the language and the legislative history of the Act reflect Congress' intent to sanction alternatives to partition and that, serious hardships involved in relocation of the Navajos, should have caused the district court to choose alternatives other than partition.[2] They also argue that even if the district court properly chose partition, instead of alternative means for resolving the dispute, the court should have accepted the Navajo partition proposal.[3]

Both Congress and the courts have long recognized that any hope for a negotiated settlement, instead of compelled partition, was frail and that the dispute most probably could never be resolved without partition. As the *Healing* court noted fifteen years ago "[i]t was indeed the hope and probably the expectation of the Congressional sponsors" of the 1958 Act that the quiet title suit "would result in a clear-cut division of the reservation." (210 F.Supp. at 189.) Thus, at a hearing on June 18, 1958, before the House Committee on Interior and Insular Affairs on the bills which became the 1958 Act, the following colloquy occurred between Representatives Saylor and Udall:

"Mr. Saylor. The next question is: Since the purpose of this bill is to determine the rights of both the Navajo and Hopi Tribes, does the committee expect there will be a division of the lands in question?

require the relocation of 624 Navajo families. The Navajo proposal would give the Hopi slightly more than half of the total acreage, but would give the Navajo 51% of the sheep grazing units, in order to reduce the number of Navajo families that would have to be relocated to 562.

"Mr. Udall. The legislation so provides, that the Court will make determination where the boundary lies, and the lands that are determined to belong to the Navaho [*sic*] will go to the Navaho [*sic*], and you will have a new boundary determined.

"Mr. Saylor. In other words . . . when the decision of the Court is arrived at there will be a section of it probably set aside for the Hopi and a certain section set aside for the Navaho [*sic*]?

"Mr. Udall. That is exactly the case." (Id. at 189 & n.90.)

The *Healing* court, however, concluded that because the 1958 Act failed to provide for the judicial distribution of jointly-held lands, as well as lands exclusively held by a particular tribe, it lacked the power to obtain a complete resolution of the Hopi-Navajo controversy by partitioning the Joint Use Area. (*Id.* at 189–92.) The *Healing* court clearly believed that either the Bureau of Indian Affairs would act to implement the quiet title decision by seeking "a fair administration [of the Joint Use Area] as a joint reservation," or that there would be "a division thereof by agreement or Congressional enactment." (*Id.* at 192. *See also Hamilton v. MacDonald* (9th Cir. 1974) 503 F.2d 1138, 1144–45 & nn. 6–8.)

The 1974 Act, adopted after a resumption of the Hopi-Navajo conflict within the Joint Use Area, provided for the appointment of a mediator "to assist in the negotiations for the settlement and *partition* of the relative rights and interests . . . of the Hopi and Navajo Tribes" (25 U.S.C. § 640d(a) (emphasis added)), and that if the negotiations failed the district court was authorized "to make a final adjudication, *including partition*" (25 U.S.C. § 640d–3(a) (emphasis added)).

■ The House bill had originally mandated partition, setting forth criteria for establishing the boundary line between the tribes. Those criteria are similar to the considerations enumerated in § 640d–5. The Senate amended the bill and provided for negotiations, and, if these failed, adjudi-

cation. From the legislative history, it is clear that few of the members of Congress had any real hope that there would be a settlement by negotiation, but they believed that the parties should be given one more chance to settle the matter themselves. The Senate Committee on Interior and Insular Affairs, while reporting that the bill would give the district court flexibility in formulating a final decree consistent with the judgment in *Healing*, indicated that if a judicial settlement was required, it would "in all likelihood . . . include a division of the lands of the joint use area." (Sen.Rep.No.93–1177, 93d Cong., 2d Sess., p. 19.) In a separate statement, Senators Bartlett, Fannin, Hansen, and McClure added that in their view "[i]t is crystal clear that the Committee decided that such a judicial partition is inevitable, failing tribal agreement." (*Id.* at 57.) While the repeated references in the Act to "any division" or "any partition" and the separate statement of Senator Abourezk (*id.* at 53–54) bolster the Navajo contention that partition was intended to be a possible, but not a mandatory solution, it is clear from the Act's history and structure (*e. g.*, §§ 640d–11 to 640d–13 (setting up a mechanism for the relocation of persons from partitioned lands)) that Congress contemplated partition as the most likely, if not the most desirable, solution of the dispute. The mediator also recommended partition and submitted a partition line in his report. We can find no abuse of discretion in ordering partition of the Joint Use Area.

■ The Navajo assert that while partition may have been a proper result under the Act, the district court did not fulfill its responsibilities because, believing partition to be mandatory, it failed to consider other alternatives. Nothing in the record supports this contention. The statement on which the Navajo premise their entire argument occurred at the January 10, 1976, conference of the court and counsel when Judge Walsh spoke to the attorney for the Navajo:

"The Court: . . . . [Y]ou have raised the proposition first, of whether

there should be a partition; then if there is to be, could it be partitioned with the Navajos keeping the ground and paying for it. I've been thinking about that ever since I got your memoranda and rereading the reports on the Act. And I think very definitely I have to order a partition . . . . And in the report they think maybe the Mediator might be able to get the parties together differently, but they indicate very strongly they can't see how I could do anything except partition it in kind. And that is what I think I have to do."

Judge Walsh's statement is at least as susceptible of interpretation that he believed partition to be compelled by the circumstances of the case as that he believed it to be dictated by the terms of the Act. His statement indicates that after having studied the proposals of the Navajo and the history of the dispute—with which he was very familiar[4]—he concluded, as Congress had previously, that the nature of the dispute, particularly the bitter enmity between the tribes, made partition the only practicable solution. His statement suggests that his thoughts about partition mirrored, but were not mandated by, the views of the draftsmen of the 1974 Act. That the decision to partition was a reflection of the district judge's independent judgment is confirmed by a statement he made a year later at another conference with counsel:

"The Court: As I interpret the congressional legislation, my view of it is that the Congress had in mind that when the Court should decide how to dispose of the matter, by partition or *otherwise* . . . ." (Conference of January 12, 1977, Reporter's Trans., Vol. IV, p. 2. (emphasis added).)

The court was aware of its power to fashion another remedy, and we cannot say that the court abused its discretion by failing to adopt other possible solutions.

We affirm the decision to partition the Joint Use Area. That resolution was recommended by the mediator, envisaged by Congress, and has long been seen as the most likely means of fully effectuating the legal rights of the Hopi and resolving this controversy.

III

Before we can reach the question whether the specific partition line ordered by the district court is correct, we must examine the Navajo contention that the district court erroneously included approximately 50,000 acres of the surrounding Navajo Reservation in the territory to be partitioned.

The gist of the Navajo claim is this: President Arthur's Executive Order, which created the Hopi-Navajo Reservation, described the borders of that tract in terms of points along lines of longitude and latitude. The surveys and protraction diagrams which translated the Executive Order boundaries to the physical reality of the Reservation at the beginning of this century reduced its size along its south and west borders. Those erroneous surveys were in effect in 1934 when Congress by statute permanently set aside the land surrounding the Executive Order Reservation as a wholly Navajo Reservation, and they were also in effect in 1962 when *Healing* was decided. A survey officially adopted by the Department of Interior in 1965 pushed out the borders of the Executive Order Reservation to the south and west, thereby including in the Joint Use Area lands in which Navajo rights had vested. The Navajo conclude that the district court's partition, based on the 1965 survey lines, thus improperly included Navajo lands in the partition.

The district court refused to consider the Navajo claim that the earlier surveys, rather than the 1965 survey, should be used to determine the total acreage of the Joint Use Area. The court held that the bound-

---

**4.** Judge Walsh is the same judge who has heard and participated in the determination of each issue involved in the district court proceedings in *Healing* and its subsequent supplemental proceedings. He was one of the three judges who heard the evidence and joined in the original *Healing* decision and has been involved in every subsequent district court proceeding relating to the use and occupancy of the Joint Use Area.

ary issue was foreclosed, under the doctrine of *res judicata*, by the judgment in the *Healing* case. We hold that this boundary issue was not foreclosed by the prior litigation upon the application of the doctrine of either *res judicata* or law of the case.

We begin with a brief summary of *Healing v. Jones.* Federal jurisdiction to try the case rests entirely upon the Act of July 22, 1958 (P.O. 85–547, 72 Stat. 403), which described the nature of the action that could be thereafter entertained. The statute permitted the respective tribes and the Attorney General on behalf of the United States to commence or defend the action "against each other and any other tribe of Indians claiming any interest in or to the area described in such Executive order [Executive Order of December 16, 1882] for the purpose of determining the rights and interests of said parties in and to said lands and quieting title thereto in the tribes or Indians establishing such claims pursuant to such Executive order as may be just and fair in law and equity."

The Executive Order declared that "the tract of country, in the territory of Arizona, lying and being within the following described boundaries, viz: beginning on the one hundred and tenth degree of longitude west from Greenwich, at a point 36° 30′ north, thence due west to the one hundred and eleventh degree of longitude west, thence due south to a point of longitude 35° 30′ north; thence due east to the one hundred and tenth degree of longitude west, thence due north to the place of beginning, be and the same is hereby withdrawn from settlement and sale, and set apart for the use and occupancy of the Moqui, and such other Indians as the Secretary of the Interior may see fit to settle thereon."

The Hopi claimed that it had exclusive beneficial use in all of the 1882 Reservation for the common use and benefit of the Hopis, trust title being conceded to be in the United States. The Navajo contended that, subject to the trust title of the United States, it had exclusive interest in almost four-fifths of the 1882 Reservation for the common use and benefit of the Navajo.

The Navajo conceded that the Hopi had exclusive interest in the remainder. The *Healing* opinion includes a map which is a simplified version of a larger scale map of the 1882 Reservation, which was filed by the parties pursuant to stipulation of counsel, dated August 15, 1962. (210 F.Supp. at 133.)

In an exhaustive opinion, the three-judge district court concluded that the Hopi were exclusively entitled to about one-quarter of the 1882 Reservation, consisting of District 6 as defined in 1943, and the court quieted the Hopi title to that land. As to the remaining part of the Reservation, the court held that the two tribes had joint, undivided, and equal rights and interests. With respect to "the remainder of the reservation, the facts and law, as herein determined and applied, and our lack of jurisdiction to partition jointly-held lands, preclude a complete resolution of the Hopi-Navajo controversy." (210 F.Supp. at 192.)

At the threshold, we observe that the *Healing* judgment in many respects is *sui generis*, because the litigation was conducted pursuant to a statute which created jurisdiction good for one controversy only, and, as matters turned out, the jurisdiction was inadequate completely to resolve that one controversy. Thus, cases dealing with such concepts as the *res judicata* effect of a quiet title action emerging from traditional contexts are not controlling or even very useful in this case. The *Healing* judgment nevertheless finally decided a number of issues: The Hopis had exclusive entitlement to District 6 as defined in 1943; neither the Hopi nor the Navajo had any exclusive entitlement to the Joint Use Area, unless and until that property was partitioned, either by negotiation among the tribes, or, in the absence of amicable settlement, by judicial decree after a grant of statutory authority conferring jurisdiction to adjudicate partition.

█ The bar and merger aspects of *res judicata* do not apply to foreclose litigation of the particular boundary issue that the Navajo seek to raise. The claims which the Navajo and the Hopi in this case assert

against each other could not be either merged or extinguished because there is no identity between the claims asserted here and those asserted in *Healing*. Neither the Hopi nor the Navajo made claims to less than all of the Joint Use Area in the *Healing* litigation. The *Healing* court held that such claims could not have been asserted in the prior action because the court was not given jurisdiction to decide partition, and claims to less than all of the Joint Use Area necessarily entailed partition (*e. g. See,* American Law Institute, Restatement of the Law, 2d, *Judgments* (Tent. Draft No. 1, 1973) §§ 45, 61, Comments *a* and *g.*)

The only aspect of the *res judicata* doctrine with which we can possibly be concerned is issue preclusion (collateral estoppel): "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." (Restatement of the Law, *Judgments, supra,* § 68.)

The identification of the challenged boundary was not foreclosed by issue preclusion because the *Healing* judgment was not final with respect to this claim, and the claim was neither actually litigated nor necessarily decided in the prior case. The correct location of that portion of the boundary of the 1882 Reservation, which the Navajo now question, was never actually litigated in *Healing*. For the purpose of the *Healing* litigation, the parties stipulated to the 1965 survey lines by stipulating to the use of the map, heretofore mentioned, which in turn used the 1965 survey. For issue preclusion purposes, an issue is not deemed to be "actually litigated if it is the subject of a stipulation between the parties. (A stipulation may, however, be binding in a subsequent action between the parties if the parties have manifested an intention to that effect; and, under the rules of evidence applicable in the jurisdiction, an admission by a party may be admissible in evidence against that party in a subsequent action.)" (Restatement of the Law, *Judgments, supra,* § 68, Comment *e.*)

Contrary to the Hopi's contention, this boundary issue was not necessarily decided in *Healing*. The *Healing* court expressly declined to adjudicate the respective titles of the Hopi and the Navajo in the jointly-held reservation property. No persons other than the Hopi and the Navajo were involved in setting this precise boundary line between the Joint Use Area and the Navajo Reservation to which it was contiguous. *Healing,* thus, did not quiet anyone's title based upon the disputed boundary line, and the determination of the exact boundary line was not necessary to the *Healing* judgment.

A determination that the boundary line was properly set in accordance with the 1965 survey did not become law of the case. In a very real sense, the present litigation is a continuation, as well as an outgrowth, of the *Healing* case in respect of the partitioning of the Joint Use Area. On this aspect of *Healing,* the only foreclosing doctrine available is law of the case. (*See Hamilton v. Nakai* (9th Cir. 1972) 453 F.2d 152, 160.) But the *Healing* court did not issue any ruling on the precise point, and, therefore, there is no decision to which the law of the case doctrine could be applied.

The Hopi make two contentions which are not based upon preclusive principles. The first is that the true boundaries are necessarily the longitude and latitude lines set by the Executive Order. We agree, but that assumption does not lead us anywhere because the very reason for the boundary dispute is the vagueness of the legal description in the Executive Order. The Hopi also argue that none of the pre-1965 surveys or protractions were ever adopted by the Interior Department, and, therefore, the 1965 survey was the only official survey, which sets the disputed border line. We do not reach the merits of this contention because that issue was not decided by the district court. On remand, the argument can be developed with the district court's decision.

## IV

The necessity for a remand with respect to the disputed 50,000 acres means that we

cannot at this time finally resolve the controversy over the partition line. However, in the light of the long and melancholy history of this dispute and the need to resolve the remaining issues as speedily as possible, we will further narrow the controversy.

▇ The Navajo criticized the partition plan proposed by the mediator and adopted by the district court because the plan followed very closely the principle of equal distribution of land in terms of acreage and quality. The Navajo argue that the district court abused its discretion in refusing to adopt the Navajo proposal, which deviated from the equality principle in order to reduce the number of Navajo families to be relocated. While the minimization of the hardship attendant on relocation is a laudable goal, it cannot be said that an adherence to the equal distribution principle, which we announced in *Healing*, can be an abuse of discretion, particularly in the light of the admonition of the 1974 Act that the lands partitioned "shall, insofar as is practicable, be equal in acreage and quality." 25 U.S.C. § 640d–5(d).)

Although partition cannot be fully implemented until the precise boundaries of the Joint Use Area are known, the partition process need not come to a halt pending resolution of the boundary issue. The mediator drew up alternative partition plans reflecting possible determinations of the boundary dispute. Moreover, the district court may decide that particular portions of the Joint Use Area will be allocated to one tribe or the other. Despite our vacation of the partition decree, which is necessary to permit an adjudication of the boundary dispute, the district court may in its discretion enter an interim partition decree and implement such portions thereof as may be necessary or appropriate to resolve the partition controversy pending entry of a final partition decree subject to review in this court.

We reverse the order of March 11, 1976, which foreclosed litigation of the question whether the border of the Joint Use Area is set by the 1965 survey lines. We vacate the partition judgment. Nothing in our mandate invalidates any action taken pursuant to the orders of the district court heretofore issued, other than the order of March 11, 1976, prior to the date upon which our mandate is spread. The parties shall bear their own costs on appeal.

KILKENNY, Circuit Judge, dissenting:

My steadfast belief that the questioned 50,000 acre tract was before the court and adjudicated in *Healing II*, coupled with my abhorrence of prolonging this litigation, compels this dissent:

That the *Healing II* court had before it for consideration the entire 1882 reservation, including the now disputed 50,000 acres, and the rights of the individual Indians, is made perfectly clear by the court's statement of the issues in the opening three paragraphs of its opinion, which I quote:

"We have for determination in this action the conflicting claims of the Hopi and Navajo Indians in and to Indian reservation lands situated in northeastern Arizona.

"*These lands, consisting of some 2,500,-000 acres, or 3,900 square miles, were withdrawn from the public domain under an executive order signed by President Chester A. Arthur on December 16, 1882. In that order it was provided that this rectangular tract, about seventy miles long and fifty-five miles wide, hereinafter referred to as the 1882 reservation, would be '. . . for the use and occupancy of the Moqui, and such other Indians as the Secretary of the Interior may see fit to settle thereon.'*

"*The Hopi Indian Tribe has long contended that it has the exclusive beneficial interest in all of the 1882 reservation for the common use and benefit of the Hopi Indians, trust title being conceded to be in the United States. The Navajo Indian Tribe contends that,* subject to the trust title of the United States, *it has the exclusive interest in approximately four-fifths of the 1882 reservation for the common use and benefit of the Navajo*

*Indians, and concedes that the Hopi Indian Tribe has the exclusive interest in the remainder.* The controversy resulting from these conflicting claims presents what has been characterized as 'the greatest title problem of the West.'" 210 F.Supp. 125, 128–129 (D.Ariz.1962) [Footnote omitted]. [Emphasis supplied].

To determine the area before it for consideration, the court utilized a map, a simplified version of which is taken from *Healing II* at page 133 and follows:

**L E G E N D**

1882 Executive Order Area: A rectangle of land approximately 70 miles north to south and 57 miles east to west. The north boundary line is located approximately 34 miles south of the Arizona-Utah state line and the eastern line is 54 miles west of the Arizona-New Mexico state line. The northeast corner of the Executive Order Area is approximately 63 miles WSW from the Four-Corner Monument marking the corner common to Arizona, New Mexico, Colorado, and Utah.

Boundary conceded by the Navajo to be Hopi.

Boundary of Land Management District 6 as originally created in 1936.

Boundary of Land Management District 6 as approved April 24, 1943.

Note: This map represents a simplified version of one in larger scale filed in the records of the case pursuant to stipulation of counsel for the parties dated August 15, 1962.

The *Healing II* court, after recognizing that its authority to proceed was based on the Act of July 22, 1958, 72 Stat. 403, went on to say:

"The 1958 act authorized the chairmen of the tribal councils of the respective tribes, and the Attorney General on behalf of the United States, *to commence or defend an action against each other and any other tribe of Indians claiming any interest in or to the 1882 reservation. As indicated in section 1 of the act, the purpose of any such action would be to determine the rights and interests of these parties in and to the lands and to quiet title thereto in the tribes or Indians 'establishing such claims pursuant to such Executive order as may be just and fair in law and equity.'*

"*With respect to any interest which either tribe or the Indians thereof might be thus found to have in any of the lands, it was provided, in section 2, that the court would determine whether such interest is exclusive or otherwise.* Under that section, lands in which either tribe or the Indians thereof are determined to have the exclusive interest shall thereafter, in the case of the Navajos, 'be a part of the Navaho [sic] Indian Reservation,' and, in the case of the Hopis, 'be a reservation for the Hopi Indian Tribe.'" 210 F.Supp. at 130. [Emphasis supplied].

All parties concede that the map includes the disputed 50,000 acre tract.

That the *Healing II* court actually assumed jurisdiction over the entire 1882 reservation is made conclusive by the following excerpt from the opinion.

"The applicable facts and law of this case do not permit of a declaration that one tribe or the other has the exclusive interest in all of the 1882 reservation; or that all of the 1882 reservation is divisible into areas of exclusive interest from one tribe or the other. The only part of the reservation which may be, and herein is, so classified is the district 6 area, as defined on April 24, 1943, the Hopi Indian Tribe having the exclusive interest therein. *As to the remainder of the reservation, the Hopi and Navajo Indian Tribes have joint, undivided, and equal interests as to the surface and sub-surface including all resources appertaining thereto, subject to the trust title of the United States.*" 210 F.Supp. 191, 192. [Emphasis supplied].

Furthermore, the court, after eliminating the District 6 area, determined that as to the remainder of the reservation, the Hopi and Navajo Indian Tribes had joint, undivided and equal interests. Clearly, the "remainder of the reservation" included the 50,000 acre tract here in dispute.

The *Healing II* court then went on to make sure that no one would misunderstand the breadth and nature of its decision by saying:

"It is just and fair in law and equity that the rights and interests of the Hopi and Navajo Indian Tribes be determined in the manner just stated, *and that the respective titles of the two tribes in and to the lands of the 1882 reservation be quieted in accordance with that determination.*" 210 F.Supp. 192. [Emphasis supplied].

Manifestly, the court could not have decided the issues before it in the absence of a description of the area involved; which description formed the basis for the map previously shown.

The original map, of which the above is a simplified version, was admitted in evidence under the provisions of a stipulation between the parties providing, among other things:

"STIPULATION IDENTIFYING BOUNDARY LINES . . ."

"It is stipulated and agreed by and between the attorneys of record for the plaintiffs and the defendants herein that:

I.

"The map submitted herewith, dated August 15, 1962, as approved by Charles Pitrat on behalf of the plaintiffs, and by J. Lee Correll on behalf of the defendants, was prepared jointly by plaintiffs and defendants, and depicts the boundaries legended thereon as follows:

| | |
|---|---|
| / / / / / / | Boundary of 1882 Executive Order Reservation. |
| ___ ·· ___ | Boundary of that portion of the 1882 Executive Order Reservation which defendants concede to the plaintiffs. |
| _____ | Boundary of Land Management District 6 as originally created in 1936. |
| ― ― ― ― ― | Boundary of Land Management District 6 as approved on April 24, 1943." |

The stipulation makes it conclusive that the hash marks marked the outer boundaries of the entire area under scrutiny. Because the parties concede that the 50,000 acres in dispute lay along and inside the southern boundary of the entire area included in the hash marks, logic compels a conclusion that the *Healing II* courts, district and Supreme, fully adjudicated the rights of the respective parties in and to the 50,000 acres.

Aside from District 6, the legal title to the remainder of the reservation, which would include the 50,000 acres, was adjudicated to the respective tribes to have joint, undivided and equal interests to the surface and subsurface, including all resources appertaining thereto, subject to the trust title of the United States. Moreover, the decision required that the respective titles of the two tribes in and to the lands of the 1882 reservation be quieted in accordance with that determination. 210 F.Supp. 191, 192.

That the stipulation was fully considered and formed a basis for the decision is made clear by Circuit Judge Hamley's order dated August 17, 1962, in which he approved the stipulation and ordered it filed as part of the record on appeal.

It is of more than ordinary significance that *Healing II* was affirmed by the Supreme Court of the United States in *Jones v. Healing*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963), *affirming* 210 F.Supp. 125. Beyond question, the *Healing II* Supreme Court decision on the interests of the respective tribes in the area shown by the map was a decision on the merits. *Hicks v. Miranda*, 422 U.S. 332, 342–345, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). The fact that *Hicks* was a dismissal by the Supreme

Court, rather than an affirmance on the merits, is of no significance.

I firmly believe that the doctrine of *res judicata* is applicable. The Supreme Court in *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948), succinctly stated the requirements for *res judicata*. "The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound . . ." The majority concedes that the court had proper jurisdiction under the 1958 Congressional legislation, and there is no doubt that the parties were in privity. Moreover, as I have noted, the *Healing II* courts, both district and Supreme, did indeed reach and adjudicate the boundary dispute of the 1882 grant. Since both suits arose from the same set of operative facts and both sought to achieve the same objective, namely a fair share of the land whether in whole or in part, *res judicata* would bar a reconsideration of the area which was the subject of the court's decision. *Small Business Administration v. Taubman*, 459 F.2d 991 (CA9 1972).

Even assuming that the *Healing II* court did not consider the boundary size as exhaustively as it might have, *res judicata* would still control. As the *Sunnen* Court noted, *res judicata* bars the parties, " 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' " See, *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 578–79, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974); *Mirin v. State of Nevada ex rel. Public Service Comm'n*, 547 F.2d 91, 94 (CA9 1976), *cert. denied* 432 U.S. 906, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977); *United States v. Kabinto*, 456 F.2d 1087, 1090 (CA9 1972), *cert. denied* 409 U.S. 842, 93 S.Ct. 40, 34 L.Ed.2d 81; *Flynn v. State Board of Chiropractic Examiners*, 418 F.2d 668 (CA9 1969). Manifestly, appellants must be barred from raising this claim when at the first trial the stipulated boundaries were unchallenged.

Even assuming *arguendo* that the doctrine of *res judicata* is inapplicable, the

concept of collateral estoppel prevents relitigation of this issue. Collateral estoppel is a much narrower principle than *res judicata* for it only prevents relitigation of specific issues that were litigated in a prior action. *Clark v. Watchie*, 513 F.2d 994, 998 (CA9 1975), *cert. denied* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). There the court established a three part test for the invocation of collateral estoppel: a final judgment on the merits, privity of parties, and identity of issues. Each test is met by *Healing II's* consideration of the boundaries. The first two parts of the collateral estoppel test—a final judgment on the merits and privity—were obviously satisfied. The remaining requirement is an identity of issues. Again I would rely on the *Taubman* authority which holds that when the objective facts are identical and the suit has the same objective, namely settling the title dispute, then there is an identity of issues.

The majority rejects the application of collateral estoppel because the parties entered into a stipulation as to the boundaries of the 1882 tract at the commencement of the *Healing II* litigation. They hold that a stipulation is not actually litigated and, therefore, cannot be used to collaterally estop. However, such a rigid rule is not the law.

Despite what is said by the majority, a stipulated fact in an initial proceeding may collaterally estop consideration of the same issue in a second proceeding. *Eastern Foundation Co. v. Creswell*, 154 U.S.App. D.C. 240, 475 F.2d 351, 354 (1973). There the amount of damages due appellee was stipulated in the first trial. In a later suit appellee sought this amount from its excess liability insurer. The court rejected appellee's claim to the full amount because the damage figure was stipulated in the first trial and was "not necessary to the decision." Additionally, the court noted that the appellant insurer had not been a party to the earlier litigation. From *Eastern Foundation* we can reason that a fact necessary to the first decision, even if stipulated, could serve to collaterally estop a later relitigation of the same question. *See also, Travelers Indemnity Co. v. State Farm Mutual Automobile Ins. Co.*, 330 F.2d 250 (CA9 1964).

Certainly, the Restatement of Judgments does not suggest that stipulated facts cannot be used to claim collateral estoppel. § 68 *Comment* h says that it is a "question of the interpretation of the stipulation whether it is binding on the parties only with reference to the particular cause of action sued upon, or whether it is binding in subsequent actions between them based upon different causes of action." The interpretation of Judge Walsh, who has been a participant in this litigation from its very inception, should be upheld.[1]

In addition to the quarrels I have with the majority's legal analysis, I also have problems with the practicality of its decision. We are faced with either resolving a dispute that has been before the courts for almost twenty years or prolonging the litigation for resolution of a recently raised issue that involves only 2% of the area involved in the grant. If there is any hope that this land can be shared peacefully by both tribes, a conclusion of this unending litigation rather than more appeals and remands is the wisest course.

## CONCLUSION

I agree with the majority's conclusion that we have jurisdiction and would affirm the decision of the district court.

---

1. "IT IS ORDERED, ADJUDGED AND DECREED, *that the issues now raised by Defendants concerning the title to such lands as may have been held by individual Indians within the area described by the 1882 Executive Order Reservation* and such lands therein as may have been held by the United States in trust for the Navajo Tribe *have heretofore been fully determined and adjudicated, and it is now law of the case and res judicata that the Hopi Indian Tribe and the Navajo Indian Tribe, for the common use and benefit of their respective members,* but subject to the trust title of the United States, have joint, undivided and equal rights and interests both as to the surface and subsurface, including all resources, in and to all of the Executive Order Reservation of December 16, 1882, *lying outside of the boundaries of land management district 6, as defined on April 24, 1943, and title in and to all of that reservation except the described district 6, was accordingly quieted in the Hopi Indian Tribe and the Navajo Indian Tribe, share and share alike, subject to the trust title of the United States as a reservation.*" [Emphasis supplied].