## UNITED STATES *v.* MULLAN and others.

*(Circuit Court, D. California.* February 27, 1882.)

1. PUBLIC LANDS—KNOWN MINES—COAL.

    Whatever may have been originally the proper construction of the word "mines," as used in the pre-emption act of 1841, (5 St. 456,) the act of July 1, 1864, (13 St. 343,) gave a legislative construction to the term, which thenceforth attached to all known "coal-beds or coal-fields" in which no interest had before become vested, and withdrew such coal lands from the operation of all other acts of congress.

2. SCHOOL AND COAL LANDS—STATE SELECTIONS.

    After July 1, 1864, known coal lands were not subject to selection by the state, in lieu of sections 16 and 36, for school purposes; and the secretary of the interior had no authority to list such lands to the state on such selections.

3. PATENT VACATED—LIEN LANDS.

    Where the state selects a tract of land in lieu of a like quantity of unavailable school lands, which tract so selected is not subject to selection, and the same is listed over to the state by the secretary of the interior, and by the state thereupon patented to private parties, a court of equity, upon a bill filed by the United States, will annul the selection, listing over, and patent, whether the unlawful acts arose out of fraud, inadvertence, or mistake, or errors of law committed by the officers upon known facts, as to the authority of the state to select or the secretary of the interior to list over.

4. BILL FILED BY ATTORNEY GENERAL.

    Where a bill in chancery to annul a patent to land is filed in the name of the United States, having the signature of the attorney general of the United States, subscribed by his authority, the court is authorized to entertain the bill.

5. VESTED RIGHTS—POWER OF CONGRESS.

    The state has no indefeasible vested right to select lands in lieu of sections 16 and 36, from any particular class of lands, at any time before selection actually made. Until selection, congress may withdraw any lands from the operation of laws permitting their selection.

In Equity.

*Philip Teare* and *W. H. L. Barnes,* for complainant.

*B. S. Brooks,* for defendants.

SAWYER, C. J.   This is a bill in equity to vacate a state selection, a listing to the state by the secretary of the interior, and a patent issued by the state in pursuance thereof, to the north half of section 8, township 1 N., range 1 E., Mount Diablo meridian; the said tract having been selected by and listed to the state as school lands, in lieu of a half section of one of the sections 16, which was for some lawful reason unavailable to the state. The claim is that, at the time of the selection, listing, and issuing of the patent in question, the land was *known coal lands,* not subject to selection in lieu of school

lands, and that the listing over to the state, and issuing of the patent, were by fraud, or mistake, or error in law; at all events, without authority, and unlawful.

The facts, as clearly shown by the uncontradicted evidence, are:

That the Black Diamond Coal Company took possession of this half section of land, as early as 1861, and from that time until after the patent issued, in 1871, continued in the possession of said land, working a coal mine upon it. It had tunnels, drifts, hoisting works, and other machinery, coal bunkers of large capacity, etc., on it, costing many thousands of dollars, and had constructed a railroad, operated by steam, to transport its coal to New York Landing, on the bay, some 12 miles distant, whence it was shipped to market. There was also a mining town built upon the land in question, occupied at different times by from several hundred to over a thousand inhabitants, all engaged in coal mining on this and adjacent lands, or in some way connected with the mining interests; there being no other occasion for a town at that point, and no other occupation for its inhabitants. The lands were situated on the side of Mount Diablo, at an elevated point, the surface rough and broken, of no use for agricultural purposes, and of inconsiderable utility even for pasturing, and of but trifling value for any purpose whatever, other than for the coal mines situated and worked thereon.

The lands were surveyed and sectionized in March, 1864, the surveyor professing to proceed under the act of 1853. The land was indicated on the plats and surveys as coal land. The land was selected as school land at the instance of one Frank Barnard, and, at his suggestion, and ostensibly for his use, located by Leander Ransom, state locating agent, on June 25, 1865. It was selected at the suggestion, and, doubtless, for the real benefit, of the Black Diamond Coal Company, which was at that time in occupation. But neither Barnard nor the company took measures to perfect the title. On August 28, 1868, the defendant Mullan, while the Black Diamond Coal Company was actually in possession, working the coal mine, both as is admitted in the answer and shown by the proofs, applied to John W. Bost, surveyor general of California, to purchase the land from the state, as having been selected by the state as school land, in lieu of a corresponding half of a section 16 not available. The surveyor general objected that it was coal land, and not subject to selection; but said Mullan insisted that it was subject to selection, and that the selection had been approved by the register of the land-office; that he was entitled to purchase, having offered to comply with the state law upon the subject; and that if the surveyor general should refuse to permit a purchase, he could compel him to do so by *mandamus.* Whereupon, on August 25, 1868, the surveyor general accepted the application to purchase. On April 27, 1869, he certified the selection to the United States land-office, and on May 21, 1869, he issued a certificate of purchase to Mullan. On June 3, 1871, the secretary of the interior listed the land to the state "subject to any interfering rights that may exist to them." On March 28, 1871, Mullan assigned his rights to defendant Avery, but, as testified by Avery, he still retains an interest in the land. On the same day Mullan also assigned to Avery any and all right to any claim which had accrued to him against the Black Diamond Coa⊥

Company for damages resulting from working the coal mine and taking out coal since the issue to him of a certificate of purchase, upon which assignment Avery, not long afterwards, sued the said company, claiming $1,300,000 damages for coal taken out of the land. Avery denies that he knew that the Black Diamond Coal Mine was on the land at the time he acquired his interest, but admits that Mullan told him that it was in the neighborhood of coal, and that there might be coal on it. Mullan also states that he never saw the land before his purchase from the state.

The selection was made by the state, as is claimed, in pursuance of the act of congress of March 3, 1853, extending the pre-emption laws of 1841 over the public lands in California. A state patent, in pursuance of the selection, purchase, and listing, as hereinbefore stated, was issued to defendant Avery on April 6, 1871.

The first question that arises is whether the land in question was open to selection by the state. The pre-emption act of 1841 provides that *"no lands* on which are situated any known salines, or *mines,* shall be liable to entry under and by virtue of the provisions of this act."  5 St. p. 456, § 10.

The act of March 3, 1853, extends the pre-emption laws of 1841 over the public lands in California, whether surveyed or unsurveyed, "with the exception of sections 16 and 36, which shall be, and hereby are, granted to the state for the purpose of public schools in each township." "Excepting, also, *   *   *   the *mineral* lands," with other prescribed exceptions, and "with *all the exceptions, conditions, and limitations therein, except as herein otherwise provided."*  10 St. p. 246, § 6. It is further provided in section 7 that when a settlement has been made on sections 16 and 36, before the lands shall be surveyed, reserved, etc., "other lands shall be selected by the proper authorities of the state in lieu thereof." "Nor shall any person obtain the benefit of this act by a settlement or location on *mineral* lands."

In *Mining Co.* v. *Consolidated Mining Co.* the supreme court held "that the land in controversy being mineral lands, and *well known to be so when the surveys of it were made,* did not pass to the state under the school-section grant. It seems equally clear to us that the land is excepted from the grant by the terms of the seventh section of the act of 1853."  102 U. S. 175.

If sections 16 and 36 do not pass by the terms of the statute, there certainly is no good reason for permitting the same kind of land to be selected under section 7, in lieu of sections 16 and 36.  10 St. p. 247, § 7. In the act of June 1, 1864, it is provided "that when any tracts embracing *coal-beds* or *coal-fields,* constituting portions of the public domain, and which, as '*mines,*' are excluded from the *pre-emp*-

*tion act of* 1841, and which, under past legislation, are not liable to ordinary entry, it shall and may be lawful for the president to cause such tracts, in suitable legal subdivisions, to be offered at public sale to the highest bidder," etc. 13 St. p. 343, § 1. The act of March 3, 1865, further provides that any citizen who "may be in the business of *bona fide* actual coal mining on the public lands * * * shall have the right to enter, in legal subdivisions, a quantity of land * * * at the minimum price of $20 per acre," etc. 13 St. p. 529, § 1. The act of July 26, 1866, confirms selections made by the state, under past legislation, of any lands granted to the state, "provided that no *selection* made by the state *contrary to existing* laws shall be confirmed by this act" as to a certain designated class, "or to *any mineral lands.*" 14 St. p. 218, § 1.

Thus it will be seen, by a glance at the several provisions of the statutes quoted, that the statute of 1841, in express terms, excludes from pre-emption or sale all lands containing "*any known* * * * mines;*" and there is no jurisdiction or power in any officer of the government to grant such lands. The act of 1853, extending the said pre-emption laws of 1841 over California, again expressly exempts "the mineral lands," and limits the act of 1841 in its operation by "*all the exceptions, conditions, and limitations therein,* except as herein otherwise provided." One of the exceptions therein, as we have seen, is "any known * * * mines," and this limitation is not otherwise extended in the act of 1853. Again, in section 7, authorizing, in certain cases, the selection of other lands in lieu of sections 16 and 36, it is again carefully provided that no person shall "obtain the benefits of this act by a settlement or location on mineral lands." Thus, if coal mines are "known mines" or "mineral lands," within the meaning of these acts, they were expressly excluded from pre-emption, sale, or *selection* under these acts, and there is no other act authorizing a selection. Are they "known mines" or "mineral land" within the provisions of the act of congress?

It is conceded that prior to the passage of the act of 1864, cited, the land department at Washington did not regard or treat coal lands, or coal mines, as mineral lands within the meaning of the prior acts of congress. It is so stated by Commissioner Drummond, *In re Yoakum,* Copp's Public Land Laws, 674. But I am not aware of any judicial construction of these words of the statute as relating to coal lands. Whatever the proper judicial construction may have been prior to the act of 1864, congress has itself, in that act, given a legislative construction to the provisions in question, which is conclu-

sive upon the courts and departments from that time forward. Congress may not have the power, by a legislative construction which a statute will not bear, to affect the rights of parties already properly and legally vested under the statute, but it may, certainly, give a legislative construction which shall apply to all future cases and all subsequent acts. This it has, in my judgment, done in the present instance, whatever the proper prior construction may have been. The language, it has been seen, is, "when any tract embracing *coal-beds* or *coal-fields*, constituting portions of the public domain, and which, *as* 'mines,' are excluded from the pre-emption act of 1841, and which, under past legislation, are not liable to ordinary private entry," it shall be lawful to dispose of them in a prescribed mode, entirely different, and on much more onerous terms than are applicable to other public lands; and these terms are modified, but still different from other public lands, in several and all subsequent acts of congress. Here is a manifest intent to include coal lands in the definition of the terms "mines, mineral land," as used in the act of 1841, and "past legislation," otherwise the whole object and purpose of this part of the act would fail.

There are no coal lands as such mentioned in the act of 1841, or "which, 'as mines,' are excluded from the pre-emption act," or which, under past legislation, are not liable to ordinary private entry, unless they are embraced in the term "mines" or "minerals," as used in the act of 1841 and subsequent acts. Upon any other construction of the act of 1864, and subsequent acts, providing for a disposition of the coal lands in the public domain, there would be, absolutely, no lands and no subject-matter upon which these provisions in question could operate, as the coal lands provided for are only such as were excluded as "mines" in the act of 1841, and "past legislation." All coal lands not before excluded as "mines" would be governed by the ordinary statutory provisions as to a disposition of the public domain. On any other hypothesis no change in the law would be effected. It appears to me, therefore, to be indisputable that, at least since the act of 1864, and subsequent acts, on the subject, coal lands have, by legislative definition of the term "mines," as used in the act of 1841, been excluded from sale or selection otherwise than as provided in those acts. In view of these acts, and this legislative definition also, the act of 1866 excepts coal lands improperly selected from confirmation, under the terms of that act, and especially under the words any "mineral lands," in the first section.

There are railroad grants, it is true, which especially, and by express terms, provide that coal lands shall not be deemed mineral within the provisions of those acts. But this only shows that, in the opinion of congress, they would be included, if not specially in terms excluded.

From these considerations I am of opinion that the land in question was not subject to selection, and that the secretary of the interior had no power to list over to the state, or the state to grant a valid patent for it. The land not only contained coal mines, but, in the language of the act of 1841, "known mines" of coal, which were being actually and notoriously worked, and had been so worked for a period of seven years at the time defendant Mullan applied for their purchase from the state, and more than 11 years when he assigned to defendant Avery. The state had no vested right, as is claimed by defendant's counsel it had, to select lands in lieu of sections 16 and 36, so that the right to select could not be withdrawn from any particular lands or class of lands at any time before selection actually made. The indefeasible right to any particular land can only attach at the time of selection. *Ryan* v. *C. P. R. Co.* 5 Sawy. 260, affirmed in 99 U. S. 388; *Hutton* v. *Frisbie*, 37 Cal. 476; *Frisbie* v. *Whitney*, 9 Wall. 187. If she had an indefeasible vested right before an actual selection, there could be no final disposition of the public domain, so as to secure the grantee of the government a perfect title, till all the state selections should be made. If the state had an indefeasible vested right to select from any public land, then any grantee of the government, before the state's right is satisfied, would take the title, subject to be defeated by a subsequent state selection.

Upon the only other substantial question in the case I have as little doubt, viz., that the selection, listing over to the state, and the patent issued thereon by the state, can be decreed void or annulled on a bill in chancery directly filed by the United States for that purpose. The numerous decisions cited to show that the examination and decision of the land department upon the facts are conclusive, are mostly, if not all of them, collateral proceedings, where it is sought to attack the acts of those officers at law, and not by direct proceedings by the government to annul the patent.

In cases like this there is no jurisdiction or power in the officers of the land department to affect the title of the United States. There were "known mines" on the land openly and notoriously worked. It was an obvious, public, notorious, historical fact, open to everybody's

observation. The plats of surveys in the public land-office showed it to be so. A public mining town was situate on the land, occupied by miners actually engaged in working the mines. No one could be possibly ignorant of the character of the land who would investigate, or, in fact, without actually shutting his eyes against open, public, notorious, obvious facts. Mullan must have known, and Avery must have known, the truth, or else they were wilfully ignorant and blind to what the law required them to see and know. They may not have been—probably never were—on the land, and they may have never seen with their own eyes what was going on in that region, but they are bound to know, and will be deemed in law to know, what every one must see if he will take the trouble to look at land notoriously and obviously occupied as this land was; and the same must be true with respect to the public officers whose duty it was to deal with the land, having in their office plats and surveys showing that there are known coal mines on the land. There must have been either fraud, mistake, or an error of law upon known facts, in the several transactions resulting in the patent; and either is sufficient to annul it, and is sufficiently presented by the bill.

I am not disposed to think that there was actual wilful fraud intended by either of the defendants, or the officers of the government. It is much more probable that there was an inadvertence or mistake, or an error in law upon the known facts; for it is scarcely to be believed that the facts were not known, at least to the parties in this region. Indeed, they were discussed between the defendant Mullan and the surveyor general of California; and even Avery, upon his own testimony, had his attention in fact called to the probability that coal might be found on the land; and this was, doubtless, one of the inducements to advance money on it. As coal lands had been sold prior to the act of 1864 as ordinary lands, it may be that there was a misapprehension at the local land-office as to those lands being open to selection; and the facts prior to the listing being presented by parties at Washington, probably *ex parte*, it would seem that they may not have been fully comprehended or appreciated.

If the secretary of the interior was not in fact informed, and the listing was in ignorance of the facts, then there was an inadvertence or mistake. If he did know the facts, he acted beyond the scope of his jurisdiction and authority, and his act was void for want of power. That a bill on behalf of the United States will lie to annul those proceedings is clear from the authorities.

In *Moore* v. *Robbins*, 96 U. S. 533, the court says upon this point: "If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to sue for the *cancellation* of the deed of conveyance of the land as to individuals; and if the government is the party injured this is the proper course." A patent is the deed of the government.

In *U. S.* v. *Stone*, 2 Wall. 525, the court says:

"A patent is the highest evidence of title, and is conclusive as against the government, and all claiming under junior patents or titles, *until it is set aside or annulled* by some judicial tribunal. In England this was originally done by *scire facias; but a bill in chancery is found a more convenient remedy.* Nor is *fraud in the patentee the only ground upon which a bill will be sustained.* Patents are sometimes issued *unadvisedly* or *by mistake, where the officer has no authority in law to grant them*, or where another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially, not judicially. *If he issues a patent for land reserved from sale by law, such patent is void for want of authority.* * * * It is contended here by counsel of the United States that the land for which a patent was granted to the appellant was reserved from sale for use of the government, and consequently that the patent was void. And, *although no fraud is charged in the bill, we have no doubt that such a proceeding in chancery is the proper remedy, and that if the allegations of the bill are supported, that the decree of the court below cancelling the patent should be affirmed.*"

Such a bill is this in relation to lands reserved from selection and patent under the acts in question, and the allegations of the bill are fully sustained by the proofs. *Hughes,* v. *U. S.* 4 Wall. 235, and *U. S.* v. *Hughes,* 11 How. 555, and *Johnson* v. *Towsley,* 13 Wall. 83–4, establish the same principle.

In this case there must have been either fraud, an inadvertence, or mistake, or an error of law upon known facts; for in the very nature of things, in view of the open, public, notorious occupation of the lands, and the extensive mining for coal thereon, it is impossible that there could be any error of judgment as to the facts, had the evidence been laid before the officers of the land department of the government.

An objection is made that the bill is not filed by the attorney general, and in his name. The bill commences: "The United States of America, by Philip Teare, United States attorney in and for the district of California, brings this bill of complaint, * * * and thereupon your orator complains," etc. It is signed at the foot of

the bill, after the prayer for relief, "Charles Devens, Attorney General, by Philip Teare, United States Attorney for the district of California." I think it appears from the record that the attorney general brings or authorizes the filing of the bill, has control, and is the responsible manager of the case, within the principle stated in *U. S. v. Throckmorton,* 98 U. S. 70. So, also, it appears to me that the letter of the attorney general set out in the answer is full authority for the proceeding. But this bill was signed upon authority of another letter of the attorney general expressly written for the purpose.

This suit is, doubtless, prosecuted at the instigation of the Black Diamond Coal Company, and while the company, after working and exhausting the coal for years without availing itself of the right to purchase the land at a comparatively small sum, as it might and honestly should have done, and is, therefore, entitled to little sympathy should the defendants gain the land; yet the United States has seen fit to intervene to vacate the proceedings, as it had a right to do, and there must be a decree for the complainant annulling the state selection, the listing, and the patent issued thereon, and it is so ordered.