601 F.2d 1059
 UNITED STATES of America and the Quechan Tribe of Indians,
Plaintiffs- Appellants-Cross-Appellees,
v.
SOUTHERN PACIFIC TRANSPORTATION CO., Imperial Irrigation
District, et al., Defendants-Appellees-Cross-Appellants.
 Nos. 76-3596, 77-1122 and 77-1198.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 2, 1979.
 
 R. L. Knox, Jr., Horton, Knox, Carter & Foote, El Centro, Cal., for Southern Pacific Trans. Co.
 Art Bunce, Escondido, Cal., Anne Almy, Washington, D. C., for U. S. & Quechan Tribe of Indians.
 Appeal from the United States District Court for the Southern District of California.
 Before HUFSTEDLER and ANDERSON, Circuit Judges, and FIRTH,* District Judge.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 These cross-appeals arise from a suit commenced by the United States in 1974 to quiet title to lands located in eastern Imperial County, California. The Quechan Tribe of Indians ("Quechan Tribe"), formerly the Yuma Tribe of Indians, intervened to protect its claimed equitable interest in reservation land within the contested area. All parties appeal from the judgment of the district court quieting title to some of the lands in the plaintiffs and some of the lands in the defendants.
 
 
 2
 The chains of title, both solid and broken, begin with the acquisition of the territory by the United States under the Treaty of Guadaloupe Hildago (9 Stat. 922 (1848)), and by the Executive Order of January 9, 1884, declaring the United States' intention to retain possession. The contested land consists of approximately 500 acres, bounded on the east by the west bank of the Colorado River and on the south by the international border with the Republic of Mexico. The land consists of a series of lots in Sections 25, 26, 35, and 36, of Township 16 South, Range 21 East, San Bernardino Meridian.
 
 
 3
 Defendants Imperial Irrigation District ("Imperial") and Southern Pacific Transportation Co. ("Southern Pacific") claim fee simple title to different portions of the contested lands. Defendants claim title from or through the State of California ("State"). The alleged sources of the State's title are two: (1) the State's selection, on October 11, 1884, of lieu lands as indemnity for school lands lost to a private grant under the Act of March 3, 1853, and (2) title alleged to have vested automatically in the State by approval of the Ingalls Survey of 1896, under the terms of the School Lands Grant of the Act of March 3, 1853.
 
 
 4
 The United States and the Quechan Tribe contend that the State never acquired any interest in any part of the contested lands because the lands were withdrawn for the Fort Yuma Indian Reservation on January 9, 1884, cutting off any claims that the State theretofore made that could have ripened into title. They argue that the lands thus withdrawn were never reopened to settlement under the general land laws. In addition, the United States claims title to additions and accretions to Section 36 on the grounds that the State waived its right to those school lands under the Act of March 3, 1853 (10 Stat. 244), by selecting indemnity lands for acres lost in the LaCroze-Poole Survey of 1857.
 
 
 5
 To unravel the skeins of the long and complex history of this land, we must go back to the Act of March 3, 1853 (10 Stat. 244), which established the United States' public lands system for California, a newly admitted state. Section 6 of that Act granted Sections 16 and 36 in each Township to the State for public school purposes. Section 7 of the Act modified the grant by excluding therefrom those sections that had been settled prior to the survey, that had been reserved for public uses, or that were subject to private claims. The State was granted the right to select other land in lieu of the excluded sections. The State's right to select so-called "lieu lands" was repeated in Section 6 of the Act to Quiet Land Titles in the State of California (14 Stat. 218, 220 (1866)).
 
 
 6
 The lieu acts directly applicable to California are to be read in harmony with selection procedures prescribed in prior statutes. Under the Act of May 20, 1826 (4 Stat. 179), selections of lieu lands were to be made by the Secretary of the Treasury "out of any unappropriated public land within the land district where the township for which any tract is selected may be situated . . . ." The same statute specified a proportional system for granting school lands in fractional townships. The Act of February 26, 1859 (11 Stat. 385) granted in-lieu rights to compensate for school lands lost in fractional school sections. The Acts were later codified in the revised statutes and were subject to further amendments with which we are not here concerned.
 
 
 7
 Land patents were not required to convey title to lieu lands to the State. Under the Act of August 3, 1854 (10 Stat. 346), lists certified by the Commissioner of the General Land Office were to "be regarded as conveying the fee simple (title) of all the lands embraced in such lists that are of the character contemplated by such act of Congress . . . ." The lists were known as "clearlists." The clearlist conveyance was conditional, however, because the Act of August 3, 1854, provided that "where lands embraced by such lists are not of the character contemplated by such act of Congress, and are not intended to be granted thereby, said lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim or interest shall be conveyed thereby."
 
 
 8
 Poole and LaCroze first surveyed Township 16 in 1855 and 1856. The plat of this survey was approved on February 6, 1857. California Sections 25, 35, and 36 in this plat were partial sections bounded by a meander line on the west bank of the Colorado River. The southeast quarter of Section 26 was a full quarter section. California Section 36 was comprised of .9 acres of land bounded by the meander line and designated Lot 1. Between 1872 and 1888, California made indemnity selections for the 639.10 acres lost in this particular school section. On April 2, 1867, S. J. F. Jaeger filed Location No. 467[1] in the California State Land Office, pursuant to state law. With the exception of Lot 5, Section 35, this location covered what ultimately would become the Clearlist 17 lands.[2] On April 11, 1867, under the authority of the Act of March 3, 1853, and the Act of July 23, 1866, California selected these lands as indemnity for lands in another township that had been lost to a private grant, Rancho Los Coyotes.
 
 
 9
 On November 16, 1880, California was notified by the United States Land Office that the selection of April 11, 1867, was being held for cancellation as prematurely made. The basis for that ruling was that Rancho Los Coyotes had not been patented until March, 1875; therefore, the 1867 selection was premature. California did not appeal this decision within the allotted 60 days, and on March 29, 1881, the 1867 selection was canceled.
 
 
 10
 On February 24, 1882, California again attempted to select the property encompassed in the 1867 selection. The United States Land Office in Los Angeles rejected the application on the grounds that it was phrased as amendatory to the canceled selection and that Sections 25 and 35 were within an 1871 grant to the Southern Pacific.
 
 
 11
 On March 7, 1882, the State's Surveyor-General wrote to Commissioner McFarland of the United States General Land Office requesting reinstatement of California's 1867 selection. The State continued to press its claim by further correspondence. Then, in a letter dated April 17, 1883, the United States Land Office informed the State that it would be allowed to reselect the disputed property. The Southern Pacific was allowed 60 days to appeal from that decision. The Southern Pacific unsuccessfully petitioned Commissioner McFarland to reconsider and when the Commissioner declined, on June 13, 1883, Southern Pacific appealed to the Secretary of the Interior.
 
 
 12
 While Southern Pacific's appeal was pending, President Arthur issued an Executive Order on January 9, 1884, which withdrew a tract of land encompassing the present contested property as a Reservation for the Yuma (now Quechan) Tribe of Indians.
 
 
 13
 The heart of this controversy is the construction and application of the 1884 Executive Order. After the order set aside lands for the Indians, it contained the following proviso:
 
 
 14
 "Provided, however, that any tract or tracts included within the foregoing described boundaries to which Valid rights have attached under the laws of the United States are hereby excluded out of the Reservation hereby made." (Emphasis added)
 
 
 15
 The Secretary of the Interior subsequently affirmed Commissioner McFarland's decision to allow California to reselect the disputed land. (Southern Pacific Railroad Co. (Branch Line) v. California (1884) 3 Pub.Lands Dec. 88.) On October 11, 1884, two months after its successful bout with the railroad before the Secretary, California reported selections numbered 870 and 871 to the United States Land Office. These selections included the land selected in 1867 and, in addition, Lot 5, Section 35. Clearlist 17, covering selections 870 and 871, was approved by the Secretary of the Interior on October 13, 1888, and on June 22, 1889, California issued Jaeger's successor in interest, Hall Hanlon, a patent for these lands and for the .9 acre parcel of Section 36.
 
 
 16
 On December 4, 1893, the Quechan Tribe and agents of the United States concluded a cession agreement concerning the lands granted by the Executive Order of January 9, 1884. Congress ratified the cession agreement in the Act of August 15, 1894 (28 Stat. 336). The 1894 statute divided the lands of the Reservation into irrigable and non-irrigable categories. Some of the irrigable lands were to be allotted to members of the Tribe, and the balance was to be sold to settlers. The non-irrigable lands were to become part of the public domain, later to be opened to settlement and sale under the general land laws by proclamation of the President. The anticipated proclamation was never issued.
 
 
 17
 In 1895, Ingalls made a survey of Township 16. The plat of this survey was approved on August 17, 1896. The plat showed a meander line of the west bank of the Colorado River substantially to the east of the meander line of the LaCroze-Poole Survey of 1857. In the 1896 plat, Section 36 comprised four lots for a total of 55.81 acres. Additional tracts were also platted in Section 35. There was expert testimony at the trial of this suit that the west bank of the Colorado River had moved gradually eastward during the period from 1857 through 1896 by the process of accretion. Some 100 acres separated the 1857 meander line from the bank of the river in 1884.
 
 
 18
 In 1912, Charles Bump acquired a patent from the State of California for Lots 1, 2, 3, and 4 of Section 36 platted by the 1896 Ingalls Survey, excepting the .9 acre parcel previously patented to Hanlon. Imperial quieted title to the land so patented in 1956 in a California state court action against Bump, his heirs and devisees. Neither the United States nor the Quechan Tribe was personally served and they did not participate in any way in the quiet title proceedings.
 
 
 19
 After the district court received evidence in the present litigation, it found that the west bank of the Colorado River had gradually moved eastward from 1857 to 1896 by accretion. It held that the doctrine of after-acquired property was inapplicable against the United States in reference to these lands. It also held that the 1956 state court quiet title action had no effect against the title of the United States and the Quechan Tribe.
 
 
 20
 The district court divided the land into four categories:
 
 
 21
 (1) Those surveyed tracts selected by the State on October 11, 1884, and listed on Clearlist 17, approved October 13, 1888, with the exception of Lot 5, Section 35 (indemnity lands). The district court awarded this land to the defendants. The district court's theory was that the decision of the Commissioner of the General Land Office to permit the State to reselect tracts established an "inchoate" valid right to the land which attached as of the date of the decision on April 17, 1883. The court held that the State's inchoate title was a "valid right" within the meaning of the Executive Order of January 9, 1884. Therefore, the court reasoned, the land was not included within the tribal Reservation, and ultimately title was passed to the State by Clearlist 17, approved on October 13, 1888, and transmitted February 12, 1889.
 
 
 22
 The district court excluded from the first category Lot 5, Section 35, because that lot had not been the subject of an attempted selection by the State at any time prior to October 11, 1884. Therefore, the district court reasoned, the Commissioner's decision on April 17, 1883, could not have referred to that parcel, and no valid rights attached to it before January 9, 1884.
 
 
 23
 (2) The second category of land consisted of the lots platted in Section 36 by the 1896 Ingalls Survey. The district court awarded those lots to the defendants on the theory that the inclusion of the land in Section 36 by a resurvey was indistinguishable from the original survey vesting title to school lands; once a resurvey is approved, the district court held that it controlled the original survey.
 
 
 24
 (3) The district court awarded to the United States title to the accretions located east of the meander line platted in the survey of 1857, appurtenant to the tracts claimed under Clearlist 17. The tracts were not riparian lands. By 1888, a large body of land had been created between the tracts surveyed and the boundaries of the river caused by the eastward movement of the river. The district court held that title to the accretions to the tracts platted in the 1857 survey did not pass to the State by Clearlist 17; title to the accreted land remained in the United States. (Wittmayer v. United States (9th Cir. 1941) 118 F.2d 808.)
 
 
 25
 (4) The district court held that Lot 5 of Section 35 did not pass to the State under Clearlist 17. On a motion for new trial defendants claimed title to Lot 5 under a land grant to the Southern Pacific Railroad found in the Act of March 3, 1871 (16 Stat. 573). The district court held that this lot was withdrawn, not for the Southern Pacific Railroad, but for the Texas Pacific Railroad; therefore, the Southern Pacific acquired no rights to Lot 5. Because the Texas Pacific forfeited its rights by the Act of February 28, 1885, the forfeiture inured to the benefit of the United States.
 
 
 26
 * The pivot upon which the judgment below turned was the district court's decision that the State had valid rights, good against the United States, within the meaning of the Executive Order of January 9, 1884, withdrawing the contested property and establishing that property as part of the Yuma Reservation. In reaching that conclusion, the district court relied on Donnelly v. United States (1913) 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820. We disagree with the district court's premise. Reliance upon Donnelly was misplaced, and we hold that the State had no rights good against the United States at the time the lands were set aside for the Indian Reservation.
 
 
 27
 If the Executive Order had not intervened, the State would have acquired title under Clearlist 17. The inclusion of the disputed property in Clearlist 17, however, was a nullity because the lands were effectively withdrawn from the available lieu lands by the Executive Order.
 
 
 28
 Commissioner McFarland's decision on April 17, 1883, permitting California to reselect the lands described in its original 1867 selection and the Commissioner's reaffirmation of his decision on June 13, 1883, kindled the State's hope to acquire the disputed land, but the Commissioner's decision created no rights in the State that could have been successfully asserted against the United States to compel a conveyance on or before the effective date of the Executive Order of 1884.
 
 
 29
 The Donnelly case is not in point. We are unable to find any analogy between Donnelly's discussion of the law relating to perfection of private mining claims and the statutory scheme pursuant to which the State could acquire title to the disputed land in this case. To be sure, once a mining claim has been properly located upon surveyed lands and the development work has been done, the title under a patent thereafter issued will relate back to the initiationof the claim, "in the absence of adverse claim." (288 U.S. at 266, 33 S.ct. at 456.) in our case, if the state has completed all of the steps, including approval of its Clearlist 17 before the intervention of the Executive Order, its title likewise would have related back to the initiation of those proceedings. Even if we could draw an appropriate analogy between private mining claims and a congressional gift of lands to the State, nothing in Donnelly implies that the initiator of a land or mining claim has any rights good against the United States until all the requisite steps have been completed. If the Government intervenes, making an adverse claim at any time before the process is completed, no valid rights within the meaning of the Executive Order could exist. (E. g., Russian-American Packing Co. v. United States (1905) 199 U.S. 570, 577-78, 26 S.Ct. 157, 50 L.Ed. 314; Campbell v. Wade (1889) 132 U.S. 34, 38, 10 S.Ct. 9, 33 L.Ed. 240; The Yosemite Valley Case (1872) 15 Wall. (82 U.S.) 77, 87, 21 L.Ed. 82; Frisbie v. Whitney (1869) 9 Wall. (76 U.S.) 187, 195-96, 19 L.Ed. 668.)[3]
 
 
 30
 None of the State's attempted selections of lieu land was sufficiently perfected to be good against the United States before the Reservation was created. The 1867 selection was not pending on the critical date. It was canceled in 1881, and the State did not appeal from that decision. The February 25, 1882, selection was rejected upon submission. Although that decision was challenged, the remedy given was an opportunity to again select the land rather than to permit reactivation of either the 1867 or the 1882 selection.[4] Thus, the second selection was not pending on the date of the Executive Order and the October 11, 1884, selection came too late.[5] The disputed property became part of the Fort Yuma Reservation, and the United States could not thereafter pass title to the land by means of a clearlist. (Leavenworth, Lawrence, and Galveston Railroad Co. v. United States (1876) 2 Otto (92 U.S.) 733, 23 L.Ed. 634.)
 
 
 31
 The United States has title to all of the property in Category 1 in trust for the Quechan Tribe.
 
 II
 
 32
 Lot 5, Section 35, requires separate treatment. Unlike the portion of the Clearlist 17 property heretofore discussed, Lot 5 was subject to the 1871 land grant received by the Texas Pacific Railroad under the Act of March 3, 1871 (16 Stat. 573). Although this land grant purported to convey all of the land in Sections 25 and 35 to the railroad, the portion of Clearlist 17 covered by California's 1867 selection was excluded. The Secretary of the Interior decided that the 1867 selection, although ultimately canceled in 1881, was voidable rather than void. Therefore, the 1867 selection was sufficient to exclude this property from the operation of the railroad grant. (Southern Pacific Railroad Co. (Branch Line) v. California, supra, 3 Pub.Lands Dec. 88.) Only Lot 5, Section 35, first selected in 1884, was subject to that grant. Lot 5 remained subject to the Texas Pacific grant until the railroad forfeited the grant by the Act of February 28, 1885. Therefore, Lot 5 was not available for inclusion in the Fort Yuma Reservation on January 9, 1884, or for selection by California on October 11, 1884. The district court correctly concluded that the United States has title to Lot 5 because the 1885 forfeiture inured to the benefit of the United States, and it holds that title unencumbered by Indian Reservation claims. (United States v. Southern Pacific Railroad Co. (1892) 146 U.S. 570, 13 S.Ct. 152, 36 L.Ed. 1091.)
 
 III
 
 33
 The district court correctly awarded the accretion lands in Section 25 and 35 of the United States in trust for the Quechan Tribe. We need not address the theories upon which the district court relied in awarding the accretion lands to the Government because we reach the same result by a different route.[6] Disputed Clearlist 17 lands owned by the United States were riparian when the original survey of the area was approved in 1857. Additional land in Sections 25 and 35 east of the clearlist property was produced by gradual accretion. Federal law borrows state law in determining title to avulsive or accretive lands affecting riparian land owned or possessed by the United States or by an Indian Tribe. (Wilson v. Omaha Indian Tribe (1979) --- U.S. ----, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979).) Under California law, the accreted land belongs to the Government, as owner of the riparian uplands. (Cal.Civ.Code § 1014 (West 1954); City of Oakland v. Buteau (1919) 180 Cal. 83, 179 P. 170; People v. Ward Redwood (1964) 225 Cal.App.2d 385, 37 Cal.Rptr. 397. See also Hughes v. Washington (1967) 389 U.S. 290, 293, 88 S.Ct. 438, 19 L.Ed.2d 530; Jefferis v. East Omaha Land Co. (1890) 134 U.S. 178, 189, 10 S.Ct. 518, 33 L.Ed. 872.)
 
 IV
 
 34
 California's alleged title to the contested property lying within Section 36 was by a direct grant under the Act of March 3, 1853 (10 Stat. 244, 246). The act awarded California the 16th and 36th sections of every township in the State for the support of the public schools.
 
 
 35
 The boundaries of present Section 36 were first determined by the LaCroze-Poole Survey. That survey, approved on February 6, 1857, served as the official plat until August 17, 1896. The plat showed that Section 36 was a partial section comprised of .9 acres bounded by the meander lines of the Colorado River and designated as Lot 1. Defendants' title to this portion of Section 36 is uncontested.
 
 
 36
 The only issue was whether the defendants had title to the additional Section 36 land discovered upon the Ingalls Resurvey in 1895. After the Ingalls Survey was approved on August 17, 1896, that survey replaced the LaCroze-Poole Survey as the official plat of this area. The Ingalls Survey revealed that Section 36 consisted of 55.81 acres, described as Lots 1-4. Relying upon the Ingalls Survey, Bump, the defendants' predecessor in interest, applied for the land. On October 25, 1912, California issued Bump a patent for the land, excepting the .9 acre platted under the original survey and patented to Hanlon.
 
 
 37
 California could not claim any title to the disputed 55.81 acres under the LaCroze-Poole Survey because that survey excluded it. No claim of title to the State could arise, under the Act of March 3, 1853, until the Ingalls Survey. The State's right to school grant lands does not vest until the lands have been surveyed. Until that time, the land remains subject to Congress' power of disposition. (United States v. Morrison (1916) 240 U.S. 192, 36 L.Ed. 326, 60 L.Ed. 599; Heydenfelt v. Daney Gold and Silver Mining Co. (1877) 3 Otto (93 U.S.) 634, 23 L.Ed. 995.) California could base no claim to title on the Ingalls Survey, however, because the Executive Order of January 9, 1884, withdrew that property as a part of the Yuma Reservation. Therefore, Bump received nothing because the State had no title to grant. Title to the additional Section 36 land, other than the .9 acre patented to defendants' predecessor Hanlon, is in the United States in trust for the Quechan Tribe.
 
 
 38
 Affirmed in part, reversed in part, and remanded to the district court for entry of judgment consistent with the views herein expressed.
 
 
 
 *
 Honorable Robert Firth, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 In order to purchase land from the State of California under the State's in lieu land grant rights, an individual filed an application for these lands with the State Land Office. These applications were known as "locations." The Surveyor-General of California would then file a corresponding selection with the United States Land Office. Upon approval of this selection by the Secretary of the Interior, a list of the selections and a certificate of the Commissioner of the General Land Office were forwarded to the State. Upon receipt of these "clearlists," the State would patent the land to the individual who filed the original location
 
 
 [2]
 Jaeger's Location No. 467 described the subject land as: The NW 1/4 of the NE 1/4 and Lots 1, 2, and 3 of Section 35; Lots 3 and 4 of Section 25; and the SE 1/4 of the SE 1/4 of Section 26; Township 16 South, Range 21 East, San Bernardino Meridian
 
 
 [3]
 The earliest time at which the State obtains rights in lieu selection lands good against the United States is the date upon which the State has filed all the legally necessary documents for a valid selection. (Wyoming v. United States (1921) 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742, Payne v. New Mexico (1921) 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680; United States v. Mullan (D.Cal.1882) 10 F. 785, 790, Aff'd (1886) 118 U.S. 271, 6 S.Ct. 1041, 30 L.Ed. 170. See also McCreery v. Haskell (1886) 119 U.S. 327, 7 S.Ct. 176, 30 L.Ed. 408.)
 
 
 [4]
 That a reselection rather than reactivation was allowed is clear from the language of Commissioner McFarland's decision granting California the opportunity to "reselect the said land," California's otherwise unnecessary subsequent reselection of this property, and California's acceptance of title through Clearlist 17 which specifically placed the date of selection at October 11, 1884, and limited its effect to lands unappropriated on that date
 
 
 [5]
 Relying upon Shepley v. Cowan (1875) 1 Otto (91 U.S.) 330, 23 L.Ed. 424, the defendants argue that Clearlist 17 should relate back to the attempted selections of 1867 and 1882. They contend that since their predecessors commenced proceedings as early as 1867 to acquire the disputed lands, the "first in time, first in right" principle of Shepley is controlling. Shepley concerned rights of priority between Private claimants to public lands and is of no avail. The Court expressly disclaimed the applicability of a "first in time, first in right" principle to rights of priority between a private claimant and the United States. As discussed above, California's rights to the contested lands could vest no earlier than the date of selection. California accepted title to the property through a clearlist based upon a selection date of October 11, 1884, and the defendants are bound by that date
 
 
 [6]
 Although the district court awarded the Clearlist 17 lands to the defendants, it awarded the accretion lands in Sections 25 and 35 to the United States in trust for the Quechan Tribe. Relying upon Wittmayer v. United States (9th Cir. 1941) 118 F.2d 808, it concluded that an exception to the general accretion doctrine was warranted. The Wittmayer exception provides that where substantial accretion has occurred between the time of the survey and the time of the land's conveyance, the survey line rather than the waters of the once adjoining stream will be treated as the true boundary