Abbott **SEKAQUAPTEWA**, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe, Including all Villages and Clans thereof, and on behalf of any and all Hopi Indians claiming any interest in the lands described in the executive order dated December 16, 1882, Plaintiff-Appellee,

v.

Peter **MacDONALD**, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe, Including all Villages and Clans thereof, and on behalf of any and all Navajo Indians claiming any interest in the lands described in the executive order dated December 16, 1882, Defendant-Appellant,

Benjamin R. Civiletti, Attorney General of the United States, on behalf of the United States, Defendant-Appellee.

No. 79–3339.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1980.

Decided Aug. 21, 1980.

---

Belinda K. Barrington, Phoenix, Ariz., on brief, for defendant-appellant.

John S. Boyden, Scott C. Pugsley, Salt Lake City, Utah, on brief; John Paul Kennedy, Salt Lake City, Utah, for plaintiff-appellee.

Before ANDERSON and SKOPIL, Circuit Judges, and BONSAL,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

This appeal represents the most recent chapter in the continuing controversy between the Navajo and the Hopi over disputed reservation lands. At issue here is approximately 50,000 acres which the Navajo claim is held exclusively by itself, and which the Hopi claim is held jointly by the two tribes. The resolution of this issue is dependent upon the location of a disputed boundary line. The court below granted summary judgment in favor of the Hopi. We affirm.

## I. *FACTUAL BACKGROUND*

In 1882, President Arthur started the wheels of the present dispute in motion when he set aside, by an Executive Order, 2.5 million acres of land in northeastern Arizona (referred to as the 1882 Reservation). This was done for the use and occupancy of the Hopi and "such other Indians as the Secretary of the Interior may see fit to settle thereon." The 1882 Reservation is rectangular, about seventy miles long and fifty-five miles wide. In the Executive Order the boundaries to the reservation were described solely by lines of longitude and latitude.[1]

---

* The Honorable Dudley B. Bonsal, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. The Executive Order provided as follows:
 "Executive Mansion,
 "December 16, 1882
 "It is hereby ordered that the tract of country, in the territory of Arizona, lying and being within the following described boundaries, viz: Beginning on the one hundred and tenth degree of longitude west from Greenwich, at a point 36°30′ north; thence due west to the one hundred and eleventh degree of longitude west, thence due south to a point of longitude 35°30′ north; thence due east to the one hundred and tenth degree of longitude west, thence due north to the place of beginning, be and the same is hereby withdrawn from settlement and sale, and set apart for the use and occupancy of the Moqui [Hopi], and such other Indians as the Secretary of the Interior may see fit to settle thereon.
 "CHESTER A. ARTHUR"
 As printed in *Healing v. Jones*, 210 F.Supp. 125, 129 n.1 (D.Ariz.1962), *aff'd* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963).

In 1900, 1901, and 1907, the lands along the southern and western boundaries of the 1882 Reservation were withdrawn, by Executive Order, for the use of the Navajo. Additionally, the Navajo were the "other Indians" which the Secretary of the Interior "saw fit" to settle on the 1882 Reservation with the Hopi.

For three quarters of a century, the Hopi and the Navajo coexisted on the 1882 Reservation; neither tribe had a clear right to the land. The Hopi claimed that they had exclusive beneficial use to all of the 1882 Reservation. The Navajo claimed an exclusive interest to almost four-fifths of the reservation.

To resolve the question created by the tribes' conflicting claims, Congress, in 1958, passed Public Law 85–547, 72 Stat. 403 (the 1958 Act). This act ratified the 1882 Reservation and authorized either tribe to initiate a quiet title action to determine their respective rights and interests to the land. Proceeding under this Act, the chairman of the Hopi filed suit against the Navajo and William Rogers, who was then the Attorney General of the United States. Pursuant to the terms of the act, a three-judge court was constituted to hear the case.

The first of what was to become a long line of published opinions in the present litigation was *Healing v. Jones*, 174 F.Supp. 211 (D.Ariz.1959) (*Healing I*).[2] The three-judge court found that the determination of the equitable interests and rights of the tribes presented a justiciable controversy and that the Act which conferred jurisdiction on the court was a proper exercise of Congressional power.

The second opinion was a thorough and exhaustive analysis of the merits of the controversy between the two tribes. *Healing v. Jones*, 210 F.Supp. 125 (D.Ariz.1962),

aff'd 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963) (*Healing II*). *Healing II* held that the Hopi were entitled to the exclusive possession of a portion of the 1882 Reservation, the area within Land Management District 6. As to the remainder of the 1882 Reservation, the court held that the Hopi and Navajo held joint, undivided, and equal interests to it. The jointly held area is referred to as the Joint Use Area. Unfortunately, the court concluded that it could not partition the Joint Use Area since the 1958 Act had not given the court that power.

The co-tenancy of the Navajo and Hopi in the Joint Use Area proved to be not only unsatisfactory to the tribes, but unworkable as well. Several other court decisions attest to this.[3] Finally, in 1974, Congress re-entered the dispute by passing another statute. 25 U.S.C. §§ 640d, *et seq.* This provided for the appointment of a mediator to assist in negotiating a settlement and partition of the Joint Use Area. If no voluntary agreement was reached within 180 days, the district court was given the authority to make a final partition of the Joint Use Area.

A federal mediator was appointed, but no voluntary settlement could be worked out. In 1975, the mediator submitted a report to the district court with a recommendation for the judicial partition of the Joint Use Area.

The mediator's report also raised a question as to the proper boundary for the southern and western sides of the 1882 Reservation. This is important because it affects the size of the Joint Use Area and therefore the total acreage subject to partition.

As previously noted, the Executive Order creating the 1882 Reservation described it

---

**2.** It should be noted that Judge Walsh, who granted summary judgment in the court below, was one of the panel members of the three-judge court in *Healing I*.

**3.** Decisions involving the Joint Use Area include: *Hamilton v. Nakai*, 453 F.2d 152 (9th Cir. 1971), *cert. denied*, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332; *Hamilton v. MacDonald*,

503 F.2d 1138 (9th Cir. 1974); *Sekaquaptewa v. MacDonald*, 544 F.2d 396 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774. See also *Sekaquaptewa v. MacDonald*, 619 F.2d 801 (9th Cir. 1980), and *Sekaquaptewa v. MacDonald*, 591 F.2d 1289 (9th Cir. 1979), which involve the Navajo-Hopi dispute over lands outside of the 1882 Reservation.

in terms of longitude and latitude. The only official survey of the 1882 Reservation is referred to as the 1965 Survey. The 1965 Survey was begun in 1964 and approved by the Bureau of Land Management on August 9, 1965. There is no dispute over the fact that the 1965 Survey correctly established the boundary lines as they were originally described by President Arthur in his 1882 Executive Order.

Nevertheless, the Navajo maintain that the southern and western boundary lines of the 1965 Survey should not be followed. According to the Navajo, "by means of official surveys, protractions, and historical use, reliance, and estoppel," the southern boundary to the 1882 Reservation was approximately one and one-quarter miles north of the 1965 surveyed boundary, and the western boundary was approximately one-quarter mile east of the 1965 surveyed boundary for a distance of twenty-four miles. Since the Navajo Reservation abuts the southern and western lines of the 1882 Reservation, the net result of this argument is to add approximately 50,000 acres to the exclusively Navajo reservation lands.

Essentially, the Navajo argue in favor of the southern and western boundaries as they were shown by the so-called 1914 Survey. Actually, there never was a 1914 Survey; however, we will use that term as a description for the Navajo version of the boundary line. The Navajo rely upon the following series of erroneous partial surveys and protractions as having established the "true" southern and western boundaries to the 1882 Reservation. A partial survey was made of the area along the southern boundary in 1882 and 1883. This survey mistakenly placed the southern boundary north of its true location. The Commissioner of the General Land Office never saw and never approved this survey. A railroad protraction, based on the 1883 survey line, was approved by the Acting Commissioner of the General Land Office in 1904. This protraction repeated the erroneous location of the southern boundary and compounded the mistake by the inaccurate location of the western boundary. Another railroad protraction was approved by the General Land

Office in 1907 which contained an inaccurate description of the southern and western boundaries to the 1882 Reservation. And, in 1909 and 1910 there was a resurvey of a portion of the southern boundary. This survey followed the 1883 line and repeated the earlier survey's erroneous location of the southern boundary. The plats from this survey were approved by the United States Surveyor General in 1914.

In addition to the previously explained survey evidence, the Navajo also rely upon the following evidence in support of their altered boundary. There are several maps prepared over the years by different federal agencies. These maps were apparently prepared in reliance upon the erroneous surveys and protractions which all followed from the original erroneous 1883 survey. Within the disputed area are some 758 acres of allotments which have been issued to individual members of the Navajo tribe and over 13,000 acres of railroad grant lands which have been placed in trust for the Navajo.

The Hopi, of course, favor the 1965 surveyed lines since they include another 50,000 acres into the Joint Use Area which is therefore subject to partition. The net result of this argument would mean that the Hopi and the Navajo, in theory, would equally divide the disputed 50,000 acres.

The first time it faced the boundary question, the district court agreed with the Hopi that the 1965 survey lines should be followed. The court held that the southern and western boundaries were determined in *Healing II* and that the Navajo argument was foreclosed by res judicata.

On appeal, this court reversed, finding that the "boundary issue was not foreclosed by the prior litigation [*Healing II*] upon the application of the doctrine of either *res judicata* or law of the case." *Sekaquaptewa v. MacDonald*, 575 F.2d 239, 246 (9th Cir. 1978).

Following the remand, the tribes filed statements of their contentions and identification of their evidence on the boundary issue. After fully considering the question,

the court granted summary judgment in favor of the Hopi and the 1965 survey lines. The court found that the 1965 lines correctly fixed the boundaries and that "no action or failure to act by the Congress, or by any administrative authority, or by the parties, or their predecessors in interest," in any way changed the boundaries. And, "[n]one of the maps, protractions, and/or administrative actions claimed by the Navajo defendant to have affected the 1882 Reservation boundary were formal actions in effect at least equal to an Executive Order of a President." In addition, the district court found that the *Healing II* judgment had resolved many of the issues relating to the boundaries of the 1882 Reservation and that these holdings, "under the rule of the law of the case, should not now be relitigated or altered."

The Navajo then took this appeal.

## II. DISCUSSION

When called upon to review the appropriateness of summary judgment, this court must make the same determination as was initially made in the district court. *May Dept. Store v. Graphic Process Co.,* slip op. 3411, 3413 (9th Cir. May 27, 1980). That is, we must determine whether there is a genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law. Fed.R. Civ.P. 56(c). We view the record and the inferences derived from it in the light most favorable to the non-moving party. *See Jackson v. Hayakawa,* 605 F.2d 1121, 1124 (9th Cir. 1979), *cert. denied,* 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787.

There is no dispute over the fact that the 1965 Survey correctly established the boundary lines as they had been described by the 1882 Executive Order. The question to be decided is whether the southern and western boundaries to the 1882 Reservation had been somehow changed during the period from 1882 when the land was initially withdrawn for the Indians until 1958 when Congress approved the 1882 Reservation.

In our earlier opinion on this question, we held that the boundary issue had not been raised, and therefore had not been decided in *Healing II. Sekaquaptewa, supra,* 575 F.2d at 245–247. Our remand was limited, and the only question before the district court was whether the Navajo could prove that the southern and western boundaries had been changed. *Id.* at 248. Contrary to how the Navajo may have perceived the remand, it did not provide for a wholesale reopening of all of the issues which had been decided in *Healing II.* Insofar as any issues decided in *Healing II* were of relevance to the boundary question, the district court correctly held that they were binding on the parties. *United States v. Kabinto,* 456 F.2d 1087, 1091–1092 (9th Cir. 1972), *cert. denied,* 409 U.S. 842, 93 S.Ct. 40, 34 L.Ed.2d 81; *see Kimball v. Callahan,* 590 F.2d 768, 771–772 (9th Cir. 1978), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33.

With these considerations in mind, we now turn to the arguments raised by the Navajo on the boundary issue.

The Navajo assert that the boundaries were fixed at the 1914 lines by acquiescence and estoppel. In support of their argument, the Navajo rely upon those decisions which have involved boundary disputes between states. *California v. Nevada,* —— U.S. ——, 100 S.Ct. 2064, 65 L.Ed.2d 1 (1980); *New Mexico v. Colorado,* 267 U.S. 30, 45 S.Ct. 202, 69 L.Ed. 499 (1925); *Missouri v. Iowa,* 7 How. 660, 48 U.S. 660, 12 L.Ed. 861 (1849). According to the Navajo, where two states have relied upon an erroneous boundary survey for a long period of time, the states are bound by the erroneous line, despite the error which is shown by a later re-survey.

The Navajo did not offer, nor did our research reveal, any case law which would support the Navajo assumption that the law applicable to state boundary disputes should be extended to questions involving the boundaries of Indian reservations. Moreover, in the present case, the Navajo make no showing of the type of mutual recognition or reliance upon the 1914 lines, as had been found in the state boundary cases. In fact, it was the Navajo who had stipulated,

in the *Healing II* trial, to a map showing the southern and western boundary lines as they were subsequently portrayed in the 1965 Survey. If anything, this would support a finding that not even the Navajo recognized or relied upon the 1914 lines. In the context of this case, and the issues actually decided in *Healing II*, it is properly considered as a conclusive admission. *Sekaquaptewa v. MacDonald*, 575 F.2d at 247; Restatement of the Law, *Judgments*, § 68, Comment e.

In their statement of contentions and identification of their evidence, the Navajo fail to point to any action by either a President or a Secretary of the Interior which could be characterized as even an informal recognition of altered boundaries to the 1882 Reservation. Instead, the Navajo attempt to rely upon a series of erroneous partial surveys, railroad protractions, and maps, which all stemmed from the erroneous 1883 survey. While these may have been filed and approved by lower government officials, this in itself is not sufficient to change the boundaries of an Executive Order reservation. None of these documents ever had a primary purpose of fixing the boundaries to, or reducing the size of, the 1882 Reservation; the boundary lines were always incidental to some other purpose such as showing railroad lands. *See United States v. Creek Nation*, 295 U.S. 103, 111, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935).

■ In addition, there is a presumption against changing boundary lines to Indian reservations as the Navajo attempt to have done by this court. If there is a general rule, then it is that an incorrect survey may not be relied upon to reduce the legal boundaries of an Indian reservation. The United States "could not . . . by an incorrect survey deprive the Indians of their right of occupation of the land within the legal boundaries of the reservation . . . ." *Northern Pac. Ry. Co. v. United States*, 191 F. 947, 958 (9th Cir. 1911), aff'd 227 U.S. 355, 33 S.Ct. 368, 57 L.Ed. 544 (1913). Any "error in failing to extend the survey so as to include the lands in controversy cannot prejudice the rights of the Indians." *United States v. Romaine*, 255 F. 253, 260 (9th Cir. 1919). And, the "executive order defining the limits [to the reservation] is conclusive as to the boundaries . . . ." *United States v. Stotts*, 49 F.2d 619, 620 (W.D.Wash.1930).

■ Based on the preceding discussion, we conclude that the southern and western boundaries to the 1882 Reservation were not altered by the "surveys, protractions, reliance and estoppel" as claimed by the Navajo. Any change to the boundaries of the 1882 Reservation could not be accomplished "by circumstances or procedures less formal than those attending [the withdrawal or else] confusion would be encouraged in the field of property law, a field in which certainty has undisputed advantages." *United States v. Southern Pacific Transp. Co.*, 543 F.2d 676, 690 (9th Cir. 1976), *quoting from United States v. Consolidated Mines & Smelting Co., Ltd.*, 455 F.2d 432 (9th Cir. 1971).

The Navajo argue that Congress approved the reduced boundary lines when the larger Navajo reservation was established by the Act of June 14, 1934, 48 Stat. 960 (the 1934 Act). If we were to accept this argument, we would be crediting Congress with an intention contrary to the plain meaning of the 1934 Act.

During the first decade of this century, there were three Executive Order withdrawals to the Navajo of the land along the southern and western boundaries of the 1882 Reservation. According to the Navajo, through "surveys, protractions, use, reliance and estoppel," the disputed area became a part of their Executive Order reservation created by these withdrawals. Therefore, the Navajo claim, when Congress passed the 1934 Act giving them vested rights to their Executive Order reservation, Congress approved the reduced boundary to the 1882 Reservation.

However, as we have already concluded, the boundary lines were not changed by the

surveys, protractions, reliance, or estoppel.[4] And, most certainly, the 1934 Act cannot be read as Congressional approval of a change to the boundaries of the 1882 Reservation. After all, the Act states that "nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive Order of December 16, 1882." The 1934 Act, by reference to the 1882 Executive Order, incorporates the boundary descriptions contained in President Arthur's Order which, the Navajo acknowledge, were accurately portrayed in the 1965 Survey.

We hold, as a matter of law, that the 1934 Act did not alter or affect the southern and western boundaries as they had been described in the 1882 Executive Order. The Navajo point to nothing in the legislative history of the 1934 Act which could even arguably support the strained interpretation they attempt to place upon it.

As a final argument, the Navajo also claim that within the disputed boundary area are approximately 14,000 acres covered by individual allotments and railroad grant lands which are vested for the benefit of the Navajo. On appeal, the Navajo argue that these lands cannot be "properly counted in the acreage to which the Navajo Tribe may otherwise be entitled in an 'equal' division of the 1882 Reservation." Therefore, the Navajo seek to have the Judgment of Partition "modified to reflect the prior vesting of certain railroad and allotment lands in the Navajo Tribe."

Initially, it should be noted that the individual allotments to Navajo tribal members were all partitioned to the Navajo Tribe by the district court and thereafter became a part of the Navajo Reservation. In regard to the railroad grant lands, we agree with the Hopi's argument. *Healing II* was a quiet title action which decided the rights and interests of the Navajo and the Hopi to the land within the 1882 Reservation. The *Healing II* court found that the Navajo had a joint interest to the Joint Use Area; the court also held that the Navajo did not have an exclusive interest to any part of the 1882 Reservation. *Healing II, supra,* 210 F.Supp. at 189. The Navajo had a full opportunity to argue in favor of their claim to an exclusive interest in the 1882 Reservation during the *Healing II* trial. And, as the *Healing II* court concluded, "[n]o longer will it be tenable for the Navajos to take the position that they have gained exclusive rights and interests in any part of the reservation." *Id.* at 192. We therefore hold that the district court did not abuse its discretion by failing to take into account the Navajo claims of exclusive interest to the individual allotment and railroad land grants when it partitioned the land within the Joint Use Area.

AFFIRMED.

---

4. The Navajo claim that there remains a genuine issue of material fact as to what was the "existing status" of the 1882 Reservation in 1934. In view of our conclusion that the boundary remained unchanged by any action or failure to act prior to 1934, there can be no issue of material fact. The existing status in 1934 included the boundary lines as described in the 1882 Executive Order and confirmed by the 1965 survey.