The **PECHANGA BAND OF MISSION INDIANS,** Plaintiff-Appellant,

v.

**KACOR REALTY, INC., etc., et al.,** Defendants-Appellees.

No. 80–5755.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1982.

Decided June 22, 1982.

Rehearing Denied July 21, 1982.

---

Art Bunce, Karshmer & Bunce, Escondido, Cal., for plaintiff-appellant.

John C. Christie, Jr., Washington, D. C., argued, for defendants-appellees; Rutan & Tucker, Costa Mesa, Cal., Bell, Boyd, Lloyd, Haddad & Burns, Washington, D. C., on brief.

Before CHOY, KENNEDY and FARRIS, Circuit Judges.

CHOY, Circuit Judge:

The Pechanga Band of Mission Indians claims that its reservation includes 320 acres of undeveloped land in Riverside County, California, to which the defendants hold title. The district court entered summary judgment against the Band on three independent grounds. We need reach only the ground that the Government did not grant the land to the Band in order to affirm the district court's judgment.

## I. *History*

Ownership of the land turns on events from the late 19th century. Peter Mouren, the defendants' predecessor-in-interest, obtained a patent to some of the land in 1882 and a second patent to the remainder in 1885. Due to suspected fraud by Mouren, the Government brought two lawsuits in 1894 to set aside the patents. It dropped the suits in mid-1901 prior to any decision on the merits.

The Pechanga Band derives whatever interest it may have in the land from the reservations established pursuant to two acts of Congress. In 1864, Congress empowered the President to set apart land in California "to be retained by the United States for the purposes of Indian reservations." The Four Reservations Act § 2, ch. 48, 13 Stat. 39, 40. Under the 1864 Act, the President could change reservation sites almost at will. *See Mattz v. Arnett*, 412 U.S. 481, 494 n.15, 93 S.Ct. 2245, 2252, 37 L.Ed.2d 92 (1973); *Donnelly v. United States*, 228 U.S. 243, 256–57, 33 S.Ct. 449, 452–453, 57 L.Ed. 820 (1913). Through a series of Executive Orders over the two decades after the passage of the Act, a reservation for the Pechanga Band was established, disestablished, re-established and reshaped. *See* 1 C. Kappler, *Indian Affairs, Laws, and Treaties* 819–24 (1904) (reproducing the Orders).[1] One of the Orders is especially important to this appeal. On June 27, 1882, President Arthur established a site for

---

1. In general, reservations created by Executive Order were temporary, see *Sioux Tribe v. United States*, 316 U.S. 317, 327–28, 62 S.Ct. 1095, 1100, 86 L.Ed. 1501 (1942); *United States v. Southern Pacific Transportation Co.*, 543 F.2d 676, 687 (9th Cir. 1976); and their boundaries changed frequently, see *Mattez v. Arnett*, 412

the Band's reservation which seems to have included the land presently at issue.[2]

Because the constantly-changing reservation sites under the 1864 Act proved unsatisfactory, Congress enacted the Mission Indians Relief Act, ch. 65, 26 Stat. 712 (1891). *See Arenas v. United States,* 322 U.S. 419, 421, 64 S.Ct. 1090, 1091, 88 L.Ed. 1363 (1944). The 1891 Act empowered the Secretary of the Interior to oversee the establishment of new, more secure reservations.[3]

U.S. 481, 493–94 n.15, 93 S.Ct. 2245, 2252–2253 n.15, 37 L.Ed.2d 92 (1973).

2. A difficult issue that we need not resolve is whether the 1882 reservation actually included the land at issue. The Executive Order provided:

That any tract or tracts the title to which has passed out of the United States, or to which valid, legal rights have attached under existing laws of the United States providing for the disposition of the public domain, are hereby excluded from the reservation hereby created.

Prior to the Order, Mouren had received a patent to some of the land and had taken all the steps needed to become entitled to a patent to the remainder. We reserve judgment on whether the proviso would have excluded either parcel from the reservation.

3. The sections of the 1891 Act governing the creation of reservations stated:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That immediately after the passage of this act the Secretary of the Interior shall appoint three disinterested persons as commissioners to arrange a just and satisfactory settlement of the Mission Indians residing in the State of California, upon reservations which shall be secured to them as hereinafter provided.

Sec. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and Secretary of the Interior. They shall also appraise the value of the improvements belonging to any person to whom valid existing rights have attached under the public-land laws of the United States, or to the assignee of such person, where such improvements are situated within the limits of any reservation selected and defined by said commissioners subject in each case to the approval of the Secretary of the Interior. In cases where the Indians are in occupation of lands within the limits of confirmed private grants, the commissioners shall determine and define the boundaries of such lands, and shall ascertain whether there are vacant public lands in the vicinity to which they may be removed. And the said commission is hereby authorized to employ a competent surveyor and the necessary assistant.

Sec. 3. That the commissioners, upon the completion of their duties, shall report the result to the Secretary of the Interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the commission and approved by him in favor of each band or village of Indians occupying any such reservation, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus patented, subject to the provisions of section four of this act, for the period of twenty-five years, in trust, for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village, discharged of said trust, and free of all charge or incumbrance whatsoever: *Provided,* That no patent shall embrace any tract or tracts to which existing valid rights have attached in favor of any person under any of the United States laws providing for the disposition of the public domain, unless such person shall acquiesce in and accept the appraisal provided for in the preceding section in all respects and shall thereafter, upon demand and payment of said appraised value, execute a release of all title and claim thereto; and a separate patent, in similar form, may be issued for any such tract or tracts, at any time thereafter. Any such person shall be permitted to exercise the same right to take land under the public-land laws of the United States as though he had not made settlement on the lands embraced in said reservation; and a separate patent, in similar form, may be issued for any tract or tracts at any time after the appraised value of the improvements thereon shall have been paid: *And provided further,* That in case any land shall be selected under this act to which any railroad company is or shall hereafter be entitled to receive a patent, such railroad company shall, upon releasing all claim and title thereto, and on the approval of the President and Secretary of the Interior, be allowed to select an equal quantity of other land of like value in lieu thereof, at such place as the Secretary of the Interior shall determine: *And provided further,* That said patents declaring such lands to be held in trust as aforesaid shall be retained and kept in the

The first step in the process was for him to appoint commissioners to propose reservation sites. Their selection became "valid when approved by the President and the Secretary of the Interior." The Act instructed the Secretary that "if no valid objection exists, [he] shall cause a patent to issue for each of the reservations selected by the commission." An explicit constraint on this consummating act was that "no patent shall embrace any tract or tracts to which existing valid rights have attached in favor of any person under any of the United States laws providing for the disposition of the public domain."

The Pechanga Band's present reservation was established pursuant to the 1891 Act. The commissioners' proposal included the land at issue, and President Harrison directed that the proposed site be set aside until a patent could be issued. The Secretary of the Interior, however, decided to issue a patent only to the uncontested parcels and await a judicial determination on whether Mouren had a valid right to the land at issue. Because the Government dropped its suits against Mouren prior to any decision on the merits, the Secretary never issued a patent to the Band for the land. The Secretary thus did not take the final step required under the Act to include the land in the reservation.

## II. The Pechanga Band's Arguments

The Pechanga Band makes two arguments why we should find that it has a legal interest in the land despite the Secretary's decision not to include it in the patent establishing the Band's reservation: (1) the Secretary lacked authority to remove land from the reservation established by the 1882 Executive Order, and (2) the actions taken by him pursuant to the 1891 Act effectively conveyed the land to the Band. We find neither argument persuasive.

## A. The Secretary's Authority

█ The Mission Indians Relief Act of 1891 worked to extinguish whatever interest the Band had in the land pursuant to the 1882 Executive Order. A primary purpose of the 1891 Act was to replace the old, constantly-changing reservations with new, more secure ones. Although the new reservations were to "include, as far as practicable, the lands and villages which have been in actual occupation and possession of said Indians," inclusion of the prior sites was not mandated.

The Pechanga Band asserts, however, that the 1882 Order was a presidential act that could not be reversed by the Secretary of the Interior. In support of this assertion, it cites *Sekaquaptewa v. MacDonald*, 626 F.2d 113, 118 (9th Cir. 1980), *United States v. Southern Pacific Transportation Co.*, 601 F.2d 1059, 1064 (9th Cir. 1979), and *United States v. Southern Pacific Transportation Co.*, 543 F.2d 676, 689 (9th Cir. 1976). Because the officials in those cases were not empowered to convey the land there at issue, we held that their actions had no effect. But in this case, Congress authorized the Secretary to decide what land to include in the Pechanga Band's new reservation. The Band does not contend that Congress lacked power to extinguish whatever rights were created by the 1882 Order, or that Congress could not convey that power to the Secretary.

## B. The Secretary's Actions

█ Despite the Secretary's decision not to include the land in the patent, the Pechanga Band urges us to consider the Secretary's apparent desire to enlarge the reservation. The Band has not, however, supplied us with any reason to look past the Secretary's unambiguous actions. Both opinions cited by the Band discussed intent only because the actions taken by the official did not purport to modify the reservation site. *Sekaquaptewa v. MacDonald*, 626 F.2d at 118; *United States v. Southern Pacific*

Interior Department, and certified copies of the same shall be forwarded to and kept at the agency by the agent having charge of the

Indians for whom such lands are to be held in trust, and said copies shall be open to inspection at such agency.

*Transportation Co.,* 543 F.2d at 690. In this case, the Secretary had to issue a patent to the land in order to include it in the reservation. The record is unambiguous that he purposefully elected not to take this final step. We therefore cannot speculate whether the Secretary would have preferred in the abstract to grant the land to the Pechanga Band.

### III. *Conclusion*

█ Indians have a special relationship with the federal government and are entitled to special protection. *See Red Fox v. Red Fox,* 564 F.2d 361, 365 (9th Cir. 1977). However, we cannot avoid the conclusions that the patent establishing the Pechanga Band's reservation did not include the land at issue, and that we cannot independently grant the land to the Band.

AFFIRMED.