**Roger MANYGOATS, Plaintiff,**

v.

**The OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION, Defendant.**

**No. CIV 89–1060 PCT WPC.**

United States District Court,
D. Arizona.

April 2, 1990.

---

Patterson Joe, Navajo Nation Dept. of Justice, Window Rock, Ariz., for plaintiff.

James P. Loss, Asst. U.S. Atty., Phoenix, Ariz., for defendant.

## MEMORANDUM AND ORDER

COPPLE, Senior District Judge.

Plaintiff Roger Manygoats, ("Manygoats") filed an action requesting judicial review of the Navajo and Hopi Indian Relocation Commission's ("NHIRC") determination that he was not entitled to relocation assistance benefits. Manygoats claims that the NHIRC's decision is unsupported by substantial evidence and is arbitrary, capricious and contrary to the law.

Manygoats filed a Motion for Summary Judgment to which the Defendant responded and filed a Cross–Motion for Summary Judgment. The parties briefed and argued their positions and the Court now rules on the Motion and Cross–Motion for Summary Judgment.

## I. *Factual Background* [1]

Roger Manygoats filed an application for relocation assistance benefits on August 18, 1980.[2] This request was denied on March 13, 1985. Manygoats appealed this denial and appeared before the Office of Navajo and Indian Relocation for his appeal hearing. The hearing officer rendered his decision on December 31, 1986, upholding the denial of relocation benefits. The Office of Navajo and Hopi Indian Relocation affirmed this decision on March 6, 1987. Manygoats has exhausted his administrative remedies. (Plaintiff's Statement of Facts at Section I, numbers 1–6).

Mr. Manygoats was raised near Black Mesa and lived with his parents on a customary use area now known as Hopi Partitioned Land and Navajo Partitioned Land. Manygoats' parents had several homesites called camps, eight of which were located on Hopi Partitioned Land ("HPL") and one on Navajo Partitioned Land ("NPL"). Two of the HPL sites were the oldest and had a cistern, piping system and hand pump which were constructed in 1961. (Plaintiff's Statement of Facts at Section II, numbers 1–8).

Manygoats started high school in 1972 at Tuba City High School. Manygoats commuted to this school with the assistance of his father and a school bus. During his high school years, the Manygoats lived primarily on Black Mesa on HPL. Manygoats dropped out of high school in 1973 and left to work in the Grand Canyon area. He returned to Tuba City High School in the

---

**1.** The Court incorporates, by this reference, the historical background of the Settlement Act which provided for the appointment of a mediator to assist in negotiating a settlement and partition of a joint use area used by the Navajo and Hopi Tribes. *Bedoni v. Navajo–Hopi Indian Relocation Comm'n,* 878 F.2d 1119 (9th Cir. 1989); *Sekaquaptewa v. MacDonald,* 626 F.2d 113 (9th Cir.1980); *Healing v. Jones,* 210 F.Supp.

125 (D.Ariz.1962), *aff'd per curiam,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963).

**2.** The portion of this section detailing the administrative proceedings were set forth in the Plaintiff's Statement of Facts. The Defendant does not dispute any of these facts.

spring of 1974. (Plaintiff's Statement of Facts, Section II, numbers 10–18).

Manygoats worked for the Navajo Tribe as a community service aid in 1976. During the period 1974 to 1977, Manygoats' father was unemployed and Roger supported himself by purchasing his own food and clothing. Manygoats decided to attend vocational school in September, 1977 and received funding from the Bureau of Indian Affairs to attend this training. In June of 1978, Roger Manygoats married Virginia Manygoats. (Plaintiff's Statement of Facts, Section II, numbers 19–22, 24). Manygoats and his wife and children resided with Manygoats' parents. (Plaintiff's Statement of Facts, Section II, number 28).

## II. *Disputed Issues of Fact*

The parties dispute rests solely on when Roger Manygoats became a "head of household." The Defendant claims that this occurred in June, 1978 when Roger married Virginia Manygoats. The Plaintiff claims that he attained "head of household" status when he completed his high school coursework in December, 1976. At the time he completed this work, Manygoats was 19 years old. Following his graduation, he herded sheep for himself and his family and was responsible for his own support. The Plaintiff argues that the NHIRC failed to take into account the fact that Roger supported himself and helped to sustain his parents by herding sheep following completion of his high school studies.

In the alternative, Manygoats argues that he became a "head of household" when he received public assistance from the Bureau of Indian Affairs to attend vocational training. This assistance was used for training tuition, housing food and transportation. Therefore, Manygoats argues, he attained "head of household" status in November, 1977 when he began receiving financial assistance to complete his vocational training.

As his final argument, Manygoats contends that he attained "head of household" status when he married in June, 1978. The Defendant does not argue with this date,

however, the Defendant contends that by June, 1978, Manygoats no longer lived on an area of land that would entitle him to relocation benefits. The Defendant claims that Manygoats abandoned his HPL residence before he became a head of household. The Defendant relies upon a field investigation conducted in 1986 for the denial of Manygoats' request for relocation benefits.

## III. *Statutory Entitlement to Relocation Benefits*

The Statutes enacted to assist in the negotiations for the settlement and partition of the Navajo and Hopi rights and interest provide for additional payments to the heads of households. The statute authorizing such payments follows:

**(b) Additional payments to heads of households: time**

In addition to the payments made pursuant to section 640d–14 of this title, the Commission shall make payments to heads of households identified in the report prepared pursuant to section 640d–12 of this title upon the date of relocation of such households, as determined by the Commission, in accordance with the following schedule:

(1) the sum of $5,000 to each head of a household who, prior to the expiration of one year after the effective date of the relocation plan, contracts with the Commission to relocate;

(2) the sum of $4,000 to each head of household who is not eligible for the payment provided for in clause (1) of this subsection but who, prior to the expiration of two years after the effective date of the relocation plan, contracts with the Commission to relocate;

(3) the sum of $3,000 to each head of a household who is not eligible for the payments provided for in clause (1) or (2) of this subsection but who, prior to the expiration of three years after the effective date of the relocation plan, contracts with the Commission to relocate; and

(4) the sum of $2,000 to each head of a household who is not eligible for the payments provided for in clause (1), (2) or (3)

of this subsection but who, prior to the expiration of four years after the effective date of the relocation plan, contracts with the Commission to relocate.

25 U.S.C.A. § 640d–13 (Supp.1989).

The NHIRC is assisted by the regulations found in the Code of Federal Regulations at 25 C.F.R. § 700.1 *et seq.* (1989). Pertinent portions of this regulation follow:

§ **700.69 Head of Household**

(a) Household. A household is:

(1) A group of two or more persons living together at a specific location who form a unit of permanent and domestic character.

(2) A single person who at the time his/her residence on land partitioned to the Tribe of which he/she is not a member actually maintained and supported him/herself or was legally married and is now legally divorced.

(b) Head of Household. The head of household is that individual who speaks on behalf of the members of the household and who is designated by the household members to act as such.

(c) In order to qualify as a Head of Household, the individual must have been a Head of Household as of the time he/she moved from the land partitioned to a tribe of which they were not a member.

25 C.F.R. § 700.69 (Supp.1989).

Eligibility for the services provided under this Act and these regulations require that the head of household and/or the immediate family must have been residents on 12/22/74 of an area partitioned to the Tribe of which they were not members. 25 C.F.R. § 700.147(a). The relocation benefits are only paid to those who qualify as heads of households. The benefits do not extend to individuals who would otherwise qualify for benefits, but who are members of a household who has received benefits. 25 C.F.R. § 700.147(d), (e).

IV. *The Hearing Officer's Findings*

The Hearing Officer's Findings of Fact include the following:

1. Applicant is a 29 year old male Navajo Indian, currently living in the Tonolea (Red Lake) Chapter of the Navajo Reservation.

2. Applicant was born and raised in the Black Mesa area of the Shonto Chapter, an area partitioned for use by the Hopi Indians and the Red Lake Chapter area, an area partitioned for use by the Navajo Indians.

3. Applicant's grandmother possessed a flock of sheep numbering up to three hundred (300) prior to passage of the Act. In the summer, applicant's grandmother and applicant's parents would take the sheep for grazing to the Black Mesa area and in the winter, would keep the sheep below the mesa at Red Lake.

4. Applicant attended Tuba City High School in 1973, commuting to school daily from the Red Lake Trading Post where he would board a bus to school. Applicant discontinued his studies in 1974.

5. After dropping out of school, applicant obtained a job as a dishwasher at Bright Angel Lodge at the Grand Canyon, a position he retained for several months. After ceasing his employment, he returned to Red Lake/Black Mesa and re-enrolled in high school, graduating from high school in May, 1977.

6. Following his high school graduation, applicant returned to his parents' house. In November, 1977, applicant enrolled in welding school in Phoenix. He completed his training in February, 1978 and returned to Red Lake.

7. In June, 1978, applicant married his wife. Together, applicant and his wife resided with applicant's parents. Applicant's first child, Jaye Dee, was born on September 2, 1979.

8. Applicant's grandmother, Bessie Marks, grazed her sheep at Black Mesa until a flood destroyed the cistern, pump and pipes from which water was drawn for the sheep in 1977, which destruction was ascertained in a field examination conducted by the Commission. Applicant's grandmother participated in the livestock reduction program operated by the BIA. From the time of the cistern's destruction and the sale of her sheep, the

area of Black Mesa was not used by the family.

*See* Hearing Officer's Findings of Fact and Conclusions of Law and Decision, attached as an Exhibit to the Administrative Record, at 1–3.

The Administrative Record submitted to the Court contains the testimony of Roger Manygoats and several of his relatives as well as the field investigator's report. Two Commission representatives also testified. The hearing officer relied, almost entirely, upon the testimony of the field investigators, discounting the testimony of Mr. Manygoats and all of his relatives. The field investigator reviewed an aerial photograph of the area and determined that there was no homesite in that particular area on the date required for eligibility under the statute. The field investigator testified that the homesite area did not appear on the relocation map and no improvements were found on an aerial investigation. Comparing a 1986 aerial photograph with an aerial photograph taken in 1974, the investigator determined that the Plaintiff was not a head of household at the time of his relocation.

The Hearing Officer determined that the Manygoats family left the Black Mesa area following a flood that destroyed the cistern, pump and pipes in 1977. However, the Hearing Officer did not identify testimony to support this conclusion. The Court finds no testimony of either the field investigator or the eligibility appeals specialist which supports this conclusion. The investigators concluded that, as of 1986, the claimed living quarters of the Manygoats family were abandoned and it was likely that the Black Mesa area was abandoned sometime after 1975. However, there is no testimony regarding the flood of 1977 or the use of the land following that time. Further, the testimony regarding the aerial investigation was contradicted by that of a field investigator who determined that the living quarters were present at least until 1978. The field investigator compiled his report after his January, 1986 investigation. After examining the area and listening to the Plaintiff and his relatives, the investigator concluded that the family abandoned the

homes on HPL prior to 1978. The field investigator points to no particular facts in support of his conclusion and the Court can find none.

The Court finds that Roger Manygoats was married in June, 1978 and that his first child was born on September, 2, 1979. The testimony supports the conclusion that the Manygoats were still in the HPL area at the time of this child's birth. There has been no showing that the testimony of all of the Plaintiff's relatives should be discounted when, in fact, no testimony is presented that the area was abandoned after a 1977 flood. The testimony of the Manygoats relatives indicates that the Plaintiff's parents moved sometime in 1979 after they became ill.

The Court also finds that the NHIRC's decision denying relocation benefits to Mr. Manygoats is not supported by substantial evidence in the record. *ICC v. Union Pacific Railroad,* 222 U.S. 541, 548, 32 S.Ct. 108, 111, 56 L.Ed. 308 (1912). The NHIRC seized upon an unsupported allegation that the Manygoats family moved following a 1977 flood which destroyed a cistern, pump and piping. There was no factual evidence presented to support this finding. The field investigator's report is the only evidence presented which indicates that the HPL area was abandoned. However, this report is devoid of any factual predicates. This report boldly asserts that the Manygoats family moved from their HPL home to their NPL home in 1978. The report also became the basis for the NHIRC's later conclusion that two of the Plaintiff's relatives who lived in the same area, were entitled to relocation benefits. This conclusion directly contradicts that reached on behalf of Mr. Manygoats.

Unlike the situation faced in *Bedoni v. Navajo–Hopi Indian Relocation Comm'n,* 878 F.2d 1119, 1123 (9th Cir.1989), Mr. Manygoats has established that his presence in Black Mesa was not infrequent, of short duration or for social purposes. Manygoats left the area only to attend vocational training from September, 1977 through February, 1978. Prior to and immediately

following this period, Roger Manygoats lived on HPL and worked in or around that area. He was self-supporting no later than 1976 when he began working for the Navajo Tribe, paid for his own clothing and food and was 19 years old. Manygoats became a "head of household" at that time.

In this matter, the Administrative Record establishes that Roger Manygoats qualifies as a "Head of Household" for purposes of Relocation benefits provided under Title 25. The decision of the hearing officer includes no factual basis and is unsupported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Day v. Weinberger*, 522 F.2d 1154 (9th Cir.1975).

Consistent with the above,

IT IS ORDERED:

1. Plaintiff's Motion for Summary Judgment is Granted.

2. Defendant's Cross–Motion for Summary Judgment is Denied.

3. Not later than Friday, April 20, 1990, counsel for the Plaintiff shall lodge a form of Judgment with this Court.